[No. S040527. Aug. 9, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY LEE DePRIEST, Defendant and Appellant.

**COUNSEL**

Russell S. Babcock, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—A jury convicted Timothy Lee DePriest (defendant) of the first degree murder of a young woman named Hong Thi Nguyen. (Pen. Code, § 187, subd. (a).)[1] Defendant also was found guilty of robbery (§ 211) and attempted rape (§§ 261, former subd. 2, now subd. (a)(2), 664), and of being a felon in the possession of a concealable firearm (§ 12021, former subd. (a), as amended by Stats. 1983, ch. 1092, § 326.5, p. 4062; see now § 12021, subd. (a)(1)). The jury sustained special circumstance allegations that defendant committed the murder while engaged in the commission of robbery and

---

[1] All further statutory references are to the Penal Code except as otherwise noted.

attempted rape. (§ 190.2, former subd. (a)(17)(i), (iii), now subd. (a)(17)(A), (C).) Additional findings were that defendant personally used a firearm (pistol) in committing the murder, the robbery, and the attempted rape. (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a).)

The evidence supporting the guilt verdict showed that the victim, Nguyen, was left half-naked and mortally wounded in the trash area behind the shopping center at which she worked in Garden Grove, Orange County. She was shot in the head around 6:00 p.m. on December 17, 1989, and died a few hours later. She appeared to have been sexually assaulted, and her car and purse were missing. Circumstantial evidence implicated defendant, a parolee. He was visiting family nearby at the time of the murder, he left California afterwards, and he was arrested after committing new crimes in Missouri, including the attempted murder of a police officer. Defendant possessed the murder weapon, as well as Nguyen's car and credit card, in Missouri.

After a penalty trial, the jury sentenced defendant to death. The trial court denied the automatic motion to modify the death verdict. (§ 190.4, subd. (e) (section 190.4(e)).) The court imposed and stayed a determinate sentence on the noncapital felony counts. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)

We find no prejudicial error at defendant's trial. The judgment will be affirmed in its entirety.

## I. GUILT EVIDENCE

### A. *Prosecution Case*

#### 1. *The Murder and Related Crimes*

In December 1989, defendant was on parole in San Bernardino County. He could not travel far from home or relocate without the permission of his parole officer. Several times before December 17, defendant was denied permission to move and transfer parole to Missouri. The reason was that he had not arranged for proper transportation in the form of a plane, bus, or car ride.

Defendant's girlfriend, Rhonda Lyon, last saw him in the second week of December 1989, apparently in San Bernardino County. He said he wanted to visit his uncle in Garden Grove, and then go to Missouri. Defendant confirmed these plans several times over the phone between December 12 and 17.

The last time Lyon spoke to defendant in California was at 3:58 p.m. on December 17, 1989, about two hours before the murder. He telephoned her from Garden Grove, where he was staying with his uncle, Charles Brown, and Brown's roommate, Tony Goodwin. In his phone call with Lyon, defendant announced his imminent departure to Missouri, and said he would either hitchhike or get money from relatives. Defendant mentioned his family in Missouri, and said he knew the trip would violate parole. Lyon knew of no source of income that defendant had at the time.

The murder victim, Nguyen, worked at the Perfect Bride, a bridal shop next door to the Thrifty Drug Store in Garden Grove. According to her employer, Nguyen arrived at work at 5:00 p.m. on December 17, 1989. The parking lot along the front and side of the store was full. She apparently parked her car—a white Toyota MR2—in the back. Nguyen called her family around 5:30 p.m. She indicated that she was headed home, but planned to stop at the grocery store first. She left work at some point before 6:00 p.m. She carried her purse and a white-sequined cloth appliqué at the time.

At 7:05 p.m. on December 17, two employees discarded trash behind the Thrifty Drug Store. One of them was Michael Elrod, the manager. Elrod testified that near the dumpster, in an alcove littered with debris, he saw a young woman—Nguyen—on the ground. She was naked from the waist down, and her sweater was pulled up onto her stomach. Her legs were slightly spread apart. Foam bubbled from her mouth, and she was barely breathing. When paramedics arrived and moved Nguyen's head, Elrod saw a wound in her temple and blood on the ground.

Police officers, including James Holder, arrived at the scene. Holder accompanied Nguyen in the ambulance to the hospital. Hospital personnel gave Holder a watch and jewelry retrieved from Nguyen.[2] Meanwhile, at the crime scene, $31 was found in Nguyen's jeans. Her purse and car were gone.

That same evening, possibly around 6:00 o'clock, Brown and Goodwin returned to their Garden Grove home after Christmas shopping. The home was located a few blocks from the Thrifty Drug Store. Defendant, Brown's nephew, had been a houseguest for three days. When defendant arrived the first day, he came by taxi and had no car. However, Goodwin testified that on the evening of December 17, a white Toyota MR2 he had never seen before was parked outside.[3]

---

[2] The jewelry found on Nguyen's person did not include her 18-karat gold wedding band. At trial, her husband could not account for its absence from her finger. The ring apparently was never recovered, and its whereabouts after the murder were not disclosed at trial.

[3] Goodwin testified that because the parking lights were on, he assumed someone occupied the Toyota, and that he communicated this belief when the police later interviewed him. Still

Inside the house, Goodwin noticed that defendant was sweating as he spoke to Brown. Defendant then headed toward the Toyota outside. That was the last time Goodwin saw either defendant or the car.

### 2. *Events in Missouri After the Murder*

Lyon, defendant's girlfriend, heard from him two days after his last call from California. He said he was in Missouri. He also told Lyon that, if the police contacted her, she should not disclose his location or real name.

At 8:00 a.m. on December 19, 1989, two days after the murder, defendant was seen in Springfield, Missouri with Nguyen's white Toyota MR2—a stipulated fact. Defendant was parked outside his friend Johnny Forrester's house, cleaning the interior of the car. Defendant spent time with Forrester and with his mother, Mary, and his uncle, Larry, who lived nearby. While driving Forrester in the Toyota, defendant said it belonged to his girlfriend. He had the keys to the car. Defendant gave Forrester a baby's teething ring from the console that had belonged to Nguyen and her child.

Over the next few days, defendant made statements suggesting he had good reasons for moving east. On December 20, 1989, he told Forrester at a bar that he would not go "back to California" or "to jail." Defendant patted a handgun in his waistband and showed it to Forrester. On December 23, after an encounter with Missouri police described below, defendant and Forrester drove to the home of a friend, Frank Moots. Defendant said he was "not going back" and would "shoot a cop first." He asked Moots to help paint the Toyota MR2 black. Defendant removed the California license plates and stored the car in Moots's garage.

Defendant used Nguyen's credit card at Sears in Springfield. Multiple charges were made on December 23, 1989, and appeared on a bill later sent to Nguyen's home. Defendant was asked for identification when he tried charging items in the electronics department. He then left the store. The jury saw a videotape of this transaction.

Defendant attracted police attention three times in Missouri. On December 20, 1989, the day after he arrived in Springfield, defendant triggered a police chase, and eluded capture, after he refused to make a traffic stop while

---

later, however, he realized he never saw anyone inside the car. Goodwin also told the police that the car might have moved when he and Brown pulled behind it in their car. Again, Goodwin questioned his initial perception. The "movement" might have been caused by the reflection of his car's headlights onto the Toyota. Defendant's uncle, Brown, testified for the defense that Goodwin seemed fairly certain in talking with police that the white Toyota MR2 was occupied when they saw it outside the house.

driving a white Toyota. On December 23, 1989, another officer stopped defendant, his friend Forrester, and a female companion in a Camaro following a suspicious check-cashing incident outside of Springfield. After giving a false name and exiting the car, defendant fled and eluded the officer who had made the stop, as well as others who arrived at the scene.

Defendant's most serious confrontation with Missouri police occurred on December 28, 1989, and prompted his arrest. Officer Larry Robinson recognized defendant on the street as a "suspect at large." Defendant ran when he saw Robinson. While repeatedly yelling "halt," Robinson chased defendant over a wall and fence, and into a parking lot and an alley. Robinson lost sight of defendant, reported the chase on his radio, and approached a dumpster alcove. Suddenly, defendant rose from behind the dumpster and shot Robinson, wounding him. After defendant fired more rounds and ran down the street, other officers arrived and captured him. They seized his firearm. It was the same weapon that killed Nguyen, as discussed below.

### 3. *The Murder Investigation*

Criminalists with the police and sheriff's departments examined the crime scene in Garden Grove on December 17, 1989. Marsha MacWillie photographed and collected physical evidence, and Kenny Wong collected biological evidence. They found the white cloth appliqué that Nguyen had carried from work in a parking space along the back wall of the shopping center. Inside the dumpster alcove nearby, where Nguyen was found, there was one women's shoe, a pair of underpants, and a pair of women's jeans that was turned inside out. Other items included a .25-caliber bullet casing, shoe prints on paper debris, and hair and blood specimens.[4]

Another criminalist, Elizabeth Thompson, analyzed the hair specimens to determine whether they came from Nguyen or defendant. Thompson testified that one of the recovered hairs was consistent with defendant's pubic hair and inconsistent with Nguyen's pubic hair. The other crime scene hairs, some with bloody roots, were consistent with strands taken from Nguyen's head.

---

[4] The jury learned that both MacWillie and Wong saw the victim at the hospital on December 17, 1989. MacWillie was there between 8:00 and 9:15 p.m., while Nguyen was still alive in the emergency room. With the help of a nurse, MacWillie saw and photographed a white substance in Nguyen's vagina that could have been seminal fluid. As noted, it was the job of the other criminalist, Wong, to preserve such biological evidence. At 1:00 a.m., less than one hour after Nguyen died, Wong used cotton swabs to collect fluid in her vagina. Officer Holder was present at the time. The record suggests that medical personnel had inserted a catheter in Nguyen's vagina, and cleaned the area, *before* Wong performed the swabbing procedure. No evidence identifying fluids in Nguyen's vagina was introduced at trial.

Criminalist Mary Hong tested blood at the crime scene to determine whether it came from Nguyen or defendant. At trial, Hong identified Nguyen as a possible donor of the blood and excluded defendant.

Criminalist Sharon Krenz examined shoe prints found on paper debris in the dumpster alcove and the Nike shoes that defendant wore when arrested in Missouri. As described below, Krenz used an "overlay" method whereby she compared plastic transparencies of the sole pattern on defendant's shoes with photographs of the crime scene specimens. Krenz testified that defendant's shoes were consistent with partial shoe prints found on a label sheet and a small square sheet.

MacWillie, who had processed the crime scene, examined Nguyen's Toyota MR2 for fingerprints after defendant's arrest. The car was in police custody in Missouri at the time. MacWillie lifted 27 sets of prints from the car, three of which came from the exterior or trunk and were too faint, smudged, or "unworkable" to analyze. As to the 24 workable prints, MacWillie testified that 13 of them were defendant's, many of which were found in and around the driver's compartment. The 11 remaining prints were never identified. Eight of them came from the hood of the car, and did not belong to defendant or Nguyen. MacWillie found three unidentified prints inside the car, but could not exclude defendant or Nguyen as the donor.

Criminalist Nathan Cross test fired the gun that defendant used to shoot Officer Robinson shortly before being arrested in Missouri. Defendant's firearm was a .25-caliber semiautomatic pistol. At trial, Cross identified it as the same gun that had fired the bullet removed from Nguyen's brain during the autopsy, as discussed below.

4. *Autopsy Results*

Dr. David Katsuyama, a forensic pathologist, performed an autopsy and described the results at trial. Nguyen sustained several premortem injuries. A punch or other blunt force trauma caused bruising and swelling around the eyes, discoloration on the forehead, and cuts inside the mouth from the victim's own teeth. Bruises and abrasions on the right knee and ankle, and on the left elbow, probably were caused when those extremities struck the ground.

The external examination also disclosed dark residue on the soles of Nguyen's feet, indicating she had walked without shoes. Dirt on the victim's back, especially along one side of the torso, buttocks, and hip, suggested that she had been dragged or pushed on the ground.

Internally, Dr. Katsuyama found hemorrhaging, or blood seepage, and bruising in the walls of the vagina. The vaginal tissue also contained a small

tear, about one-quarter of an inch long. Such injuries occurred before death and were consistent with sexual trauma or assault.

Discoloration on Nguyen's neck indicated manual strangulation or that external pressure had been applied. However, Dr. Katsuyama determined that the cause of death was a gunshot wound to the head. The bullet entered the left temple and was removed during the autopsy. The blast apparently caused the back of the head to strike a hard surface and to bruise on contact.

## B. *Defense Case*

Defendant denied committing the capital crime. In an effort to place the blame elsewhere,[5] the defense introduced the following evidence:

### 1. *Assault on Loc N.*

Around 5:30 p.m. on December 17, 1989, a young Vietnamese woman named Loc N. carried groceries from her car into her house on Erin Street in Garden Grove, near Thrifty Drug Store. Loc testified that a strange man followed her inside. He demanded sex, grabbed her neck, and pushed her against the wall. He fled when she indicated her husband was nearby. Loc did not identify defendant's photograph in police lineups. Though both men were fair-haired and Caucasian, defendant was not Loc's assailant.

### 2. *Lake Arrowhead Incident*

On December 17, 1989, Oscar Mink lived in a gated community in Lake Arrowhead, about a 90-minute drive from Orange County. Late that night, Mink was awakened by two or more loud male voices coming from a nearby house, where an "unseemly element" sometimes congregated. He could not see anybody from his porch. An argument seemed to be underway, and a

---

[5] For context, we summarize the theory presented in the defense opening statement at trial: Defendant was walking near the Thrifty Drug Store in Garden Grove, when "Denny," a transient defendant knew, drove up in a white Toyota MR2 and told defendant to "get in." When asked where he got the car, Denny said it was "hot," i.e., stolen. Defendant did not know that Denny had killed Nguyen in order to steal the car. Denny offered to sell defendant the car so that he could drive to Missouri. The pair stopped at defendant's uncle's house to get cash, which was less than what Denny wanted for the car. They drove to Lake Arrowhead, so that defendant could borrow money from his friend, Bianca St. James. They got lost trying to find Bianca's house, and argued about it. A man named Oscar Mink heard the argument and saw the Toyota MR2 in Lake Arrowhead. Denny agreed to take defendant's available cash in exchange for the car. Defendant dropped off Denny in San Bernardino, and drove towards Missouri that night. The next day, he found a purse and pistol in the car. Defendant kept the gun to protect himself from arrest for violating parole. For this reason, he evaded and shot at Missouri police.

name like "Danny" might have been used. After hearing one or more car doors slam, Mink saw a white Toyota MR2 speed away. He could not tell whether there was more than one person inside or what they looked like. However, Mink thought the driver was a White male. Mink called the police in response to news stories about the capital crime.

### 3. *Fingerprint Evidence*

Carl Hensgen, a defense fingerprint expert, previously worked for law enforcement agencies, and was once a colleague of MacWillie's at the Garden Grove Police Department. Hensgen testified that he visited MacWillie at work before trial, and examined the fingerprints she had lifted from Nguyen's Toyota MR2. Hensgen agreed with MacWillie's identification of defendant's prints, including those found inside the driver's compartment. However, Hensgen identified defendant as the donor of at least two prints that MacWillie viewed as inconclusive. Hensgen also questioned MacWillie's conclusions as to the workability of certain other prints. On cross-examination, Hensgen acknowledged that all fingerprints that he and MacWillie could not identify came from the car's exterior. Like MacWillie, Hensgen could not eliminate defendant or Nguyen as the donor of the three unidentified prints found inside the car.

## II. PENALTY EVIDENCE

### A. *Prosecution Case*

#### 1. *Prior Felony Convictions*

The prosecution introduced documents establishing that defendant was convicted in 1981 of burglary in Riverside County, and of rape and robbery in San Bernardino County. The latter two convictions involved separate incidents that the victims described at the penalty trial.

#### 2. *Violent Criminal Activity*

a. *Rape of Pamela B.* Pamela B. testified that, at night on May 2, 1981, she awoke to find defendant entering her home in Twentynine Palms, California. Her husband was gone. Defendant removed the bed covers and told Pamela to undress. He undressed and masturbated, and then raped her. When Pamela warned that her husband would return, defendant dressed, ripped the phone from the wall, and ran away. Defendant's 1981 rape conviction arose from this incident.

b. *Rape of Patricia W.* Patricia W. testified that, at night on June 2, 1981, she was asleep with her baby girl in Twentynine Palms, California. Her

husband was gone. Patricia awoke, saw defendant, and screamed. Defendant threatened to kill her if she did not keep quiet, and started to undress. Defendant asked Patricia to make room in the bed by moving her daughter aside. Patricia placed the baby in the crib instead. When Patricia refused to return to the bed, defendant raped her on the floor, and forced her to engage in mutual oral copulation. Defendant urged Patricia to have an orgasm and ejaculated outside of her when she expressed concern over pregnancy. Patricia objected when defendant said he wanted to spend the night. To get him to leave, Patricia suggested that he slip unseen through the back door. He took $30 from her. Defendant's 1981 robbery conviction arose from this incident.

c. *Attempted Rape of Lorinda J.* On December 23, 1989, the same day defendant used Nguyen's Sears credit card, he attacked Lorinda J. in Marionville, Missouri. Lorinda testified that she awoke at night and found defendant on top of her in bed. Lorinda shoved defendant with her feet, and told him to stop. He called her vile names and threatened to kill her if she resisted. Defendant pointed a gun-shaped object at her. They struggled, and defendant removed Lorinda's pants. Defendant removed his pants and masturbated. Lorinda refused defendant's demands to have sex, and to orally copulate and masturbate him. He touched her breast, and ejaculated on her.

Defendant dressed and demanded money. Lorinda said that she did not have much cash, and that her purse was in another room. He left through the back door. Several days later, when he was arrested for shooting Officer Robinson, defendant had some of Lorinda's jewelry in his possession. Before he was convicted of attacking her, defendant sent Lorinda a letter incorrectly stating that she had cried when a defense investigator mentioned the death penalty in conjunction with defendant.

d. *Attempted Murder of Officer Robinson.* As reflected in the penalty instructions, the jury could consider, in aggravation, Officer Robinson's testimony at the guilt phase that defendant shot and tried to kill him in Springfield, Missouri, on December 28, 1989.

3. *Victim Impact Evidence*

Nguyen's sister and husband testified about their grief over the murder. Nguyen had given birth to a daughter shortly before her death. Nguyen's sister, who came to America from Vietnam several years after Nguyen, and before the crime, regretted losing someone who could help her assimilate. No one told Nguyen's parents, who lived in Vietnam, the truth about how she died.

## B. *Defense Case*

Numerous witnesses—relatives, friends, and mental health professionals— testified on defendant's behalf. He did not take the stand.

### 1. *Life History*

Defendant was Mary DePriest's only child. According to her testimony, Mary realized at age 13, growing up in Missouri, that she preferred women over men as romantic partners. Mary had sex for money with Jim Tate, and chose another man, Jack Callison, to father her child. Defendant was born in 1960, when Mary was 17. He grew up believing that his father was Jim (who died shortly after defendant's birth). Defendant did not learn until age 13 or 14 that he was Jack's son. Mary had lost contact with Jack over the years. He died in prison.

At first, Mary cared for defendant in her parents' home in Missouri. When defendant was six months old, Mary started staying away from home, and then moved out. She ignored her mother's pleas to be a better parent. Mary explained at trial that she loved her son, but could not raise him properly. She drank and caroused at bars.

Between 1960 and 1965, Mary had a series of female lovers. Mary visited defendant during this time. Her visits were sporadic and disruptive. She once arrived at the house bloodied and bruised. Her departures upset defendant. By all accounts, defendant's grandparents gave him a stable and loving home. Defendant called both Mary and his grandmother "Mom."

Defendant became close to other members of Mary's family. They included his uncles Larry and Jimmy DePriest. Jimmy testified that he shared almost a father-son bond with defendant. Defendant also spent time with cousins Mitchell and David. They were the sons of another uncle, Ronnie DePriest, and his wife Patricia. Defendant participated in family picnics and other outings. As for family tragedies, defendant's uncle, Ronnie, was stabbed to death by his second wife. Ronnie's son David shot himself to death.

Meanwhile, in 1965, Mary started serving a 15-month prison term. Her parents, her brother Larry, and defendant visited every few weeks. After her release, Mary lived sporadically with her parents and defendant. She also lived with different female lovers.

In 1970, Mary began a serious relationship with Chris (also known as Hazel) Young. Chris had two children, John and Theresa. Because Chris was a stripper who often changed jobs, the couple lived in different places (e.g.,

Kansas, Oklahoma, South Carolina, Mississippi, and New Mexico). Typically, the adults would move to the new city first, bring defendant and/or Chris's children to join them later, and then move again in a few months and repeat the process. Between moves, defendant stayed with his grandparents. Mary's mother testified that the nomadic lifestyle disrupted defendant's schooling. She also accused Chris of disciplining defendant too harshly.

Chris testified, in turn, that Mary's mother dominated everyone in the family, including her husband and male children. She reportedly waged a "tug-of-war" with Mary and Chris over defendant. Chris also described gatherings with Mary's extended family as alcohol-fueled and volatile. Mary and Chris sometimes fought verbally and physically, especially while drinking alcohol. Chris and other witnesses portrayed defendant as a quiet, respectful boy. He called Chris "Mom," and was close to her children.

In New Mexico, Mary and Chris ran an escort and prostitution service. Defendant saw Mary and Chris being arrested outside the business. Subsequently, in 1975, Mary sent defendant to Missouri to live with her parents. Mary, Chris, and Chris's children returned to Missouri in 1976, and lived near defendant and his grandparents. Mary and her brother Larry admitted smoking marijuana with defendant at parties around this time. Two former high school friends of defendant's testified that other drugs were consumed by teenagers and adults on such occasions.

Defendant joined the Marines at age 17. According to his sergeant, defendant performed adequately while stationed on a remote Alaskan air base. One of defendant's former high school friends testified that defendant became more aggressive after joining the Marines. During visits home, he smoked marijuana and took LSD.

At trial, Mary expressed regret for being a terrible mother, and spending more time with her lovers than with her son. She described herself as manic-depressive. Mary and other witnesses did not want defendant to die.

The penalty jury heard testimony that defendant was serving a sentence of "life plus 57 years" for crimes committed in Missouri.

## 2. *Mental Condition*

Dr. Raymond Anderson, a psychologist, interviewed and tested defendant. Dr. Anderson opined that defendant suffered from an unspecified and borderline personality disorder involving sexual fixation on rape fantasies, and drug dependence. His personality is unformed and anxious, making it difficult for him to interact on an intimate or long-term basis. Dr. Anderson attributed

these conditions to defendant's emotional abandonment by his mother, his confusion over her lesbianism and his own sexual identity, his deep anger toward women, and his disorientation over his father's identity. Defendant took drugs to suppress these feelings. Dr. Anderson theorized that defendant might confuse rape with romance. Cross-examination disclosed that defendant's test results were consistent with an antisocial personality disorder. Dr. Anderson did not ask defendant questions to explore such a diagnosis, or learn about his criminal history.

Dr. Rashami Skadegaard, a psychologist, interviewed defendant and his relatives, and studied his social history. Dr. Skadegaard emphasized defendant's psychosexual disturbance. Contributing factors were a pattern of emotional abandonment by defendant's mother, her promiscuous gay lifestyle and aggressive personality, defendant's resulting sexual confusion, feelings of worthlessness and rage towards women, frequent moves that prevented lasting social attachments, exposure and desensitization to violence and drugs in the family, a family history of mental illness, lack of a father figure or strong male role model, and conflicted homosexual and homophobic feelings trigged by service in the Marines. Dr. Skadegaard alluded to two possible incidents of child sexual abuse by older males, including a relative. Defendant raped in a "sick" attempt to assert his masculinity and gain intimacy.

### III. Jury Selection

#### A. *Challenges for Cause*

Defendant argues here, as below, that the trial court's rulings on five challenges for cause violated *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*). As a result, he allegedly was deprived of federal and state constitutional guarantees regarding an impartial jury, due process, equal protection, a reliable death verdict, and cruel and unusual punishment. We disagree.[6]

---

[6] As to this and almost every other appellate claim, defendant contends the alleged error infringed his constitutional rights. Most of the time, defendant raised the issue in the trial court, and explicitly mentioned the constitutional theories advanced on appeal. As to those relatively few instances in which he did not present constitutional theories below, it appears that either "(1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581] (*Boyer*), citing *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765].) On the merits, no separate

### 1. *Background*

The trial court granted the prosecution's challenges for cause to three prospective jurors—M.B., G.G., and B.T.—made on grounds they were biased against the death penalty and prosecution efforts to impose it here. The trial court also denied defense challenges for cause to two prospective jurors—J.C. and K.E.—whose past or present association with law enforcement allegedly biased them in favor of both the prosecution and a death sentence.

The trial court extensively questioned each juror about capital punishment and related factors affecting the juror's willingness and ability to follow the law and be fair. The court allowed substantial followup questioning by counsel, and heard extensive arguments on both sides about each challenge. All of the contested rulings ran contrary to defense objections and arguments. As to both J.C. and K.E., whom defendant unsuccessfully sought to excuse for cause, the defense exercised a peremptory challenge. Indeed, defendant used all of his peremptory challenges, expressed dissatisfaction with the jury, and unsuccessfully sought one more peremptory challenge.

### 2. *Applicable Law*

■ Qualification to serve on a capital jury is not limited to determining whether the person zealously opposes or supports the death penalty in every case. Under federal and state law, a prospective juror may be excluded for cause where his views on capital punishment would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Witt, supra,* 469 U.S. 412, 424, clarifying *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 88 S.Ct. 1770] [framing issue as whether it is "unmistakably clear" the prospective juror would "automatically" (italics omitted) vote for life or death].) The *Witt* standard applies to both prosecution and defense challenges. (*Morgan v. Illinois* (1992) 504 U.S. 719, 728–729 [119 L.Ed.2d 492, 112 S.Ct. 2222]; *People v. Heard* (2003) 31 Cal.4th 946, 959 [4 Cal.Rptr.3d 131, 75 P.3d 53].) At bottom, capital jurors must be willing and able to follow the law, weigh the sentencing factors, and choose the appropriate penalty in the particular case. (*People v. Stewart* (2004) 33 Cal.4th 425, 446–447 [15 Cal.Rptr.3d 656, 93 P.3d 271]; *Heard, supra,* 31 Cal.4th at p. 958.)

■ The trial court's findings as to the nature and effect of a prospective juror's views on capital punishment and related topics (e.g., law enforcement)

---

constitutional discussion is required, or provided, where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here.

receive substantial deference on appeal. (*People v. Ledesma* (2006) 39 Cal.4th 641, 675 [47 Cal.Rptr.3d 326, 140 P.3d 657] (*Ledesma*); *People v. Griffin* (2004) 33 Cal.4th 536, 558–559 [15 Cal.Rptr.3d 743, 93 P.3d 344].) Indeed, where answers given on voir dire are equivocal or conflicting, the trial court's assessment of the person's state of mind is generally binding on appeal. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1007 [47 Cal.Rptr.3d 467, 140 P.3d 775] (*Lewis and Oliver*).) The trial court is in the unique position of assessing demeanor, tone, and credibility firsthand—factors of "critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown* (2007) 551 U.S. 1, ___ [167 L.Ed.2d 1014, 127 S.Ct. 2218, 2224].) Hence, the trial judge may be left with the "definite impression" that the person cannot impartially apply the law even though, as is often true, he has not expressed his views with absolute clarity. (*Witt, supra,* 469 U.S. 412, 425–426.) For reasons we now describe, the record prevents us from second-guessing the trial court's decisions excusing and retaining the prospective jurors challenged for cause here.

### 3. *Analysis of Decision Granting Three Prosecution Challenges*

Prospective Juror M.B. initially stated on voir dire that he could keep an open mind on sentencing, and did not oppose the death penalty. He admitted, however, that he did not want the responsibility of making such a difficult decision himself. He was reluctant to pass judgment on any capital defendant, and doubted he could impose death even if the evidence indicated it was appropriate in the particular case. M.B. emphasized that he might vote for life "regardless of the evidence" in order to avoid making a decision on death. When defense counsel asked whether he could conceive of a case in which death would be a viable option, M.B. said, "no."

Prospective Juror G.G. stated at the start of voir dire that he did not oppose the death penalty and would not automatically vote against it. However, most of his answers seemed to contradict this view. G.G. said he would be bothered by having to make such a difficult decision, and wanted somebody else to do it. G.G. gave several reasons for not wanting to sit on a capital jury, including the fact that he was HIV-positive and had once spent several nights in jail. G.G. would not say "yes" when asked point-blank whether he could, and would, consider imposing death based on the evidence. Instead, he continued to equivocate, and said, "I would not want to put somebody to death right now." G.G. declined to tell either the prosecutor or defense counsel that death was a "possibility" in any case.

Prospective Juror B.T. strongly disfavored the death penalty. On the one hand, he said he would try to suppress such feelings, and would not automatically reject death or ignore the evidence. On the other hand, he

thought it was wrong for anybody, including him as a juror, to take a life. Later, after a break in questioning, B.T. said his feelings had crystallized and that he could not say the death penalty was morally appropriate in any case. In other words, he would "almost always" vote against it.

Though their responses were not uniform or absolute, all three of the foregoing jurors indicated they would have extreme difficulty imposing capital punishment, even in an appropriate case. "Those answers, in combination with the trial court's firsthand observations, could give rise to a definite impression that [their] views on the death penalty would substantially impair the performance of [their] duties." (*Lewis and Oliver, supra,* 39 Cal.4th 970, 1007.) We thus defer to the court's ruling sustaining the prosecution's challenges for cause.

### 4. *Analysis of Decision Denying Two Defense Challenges*

Prospective Juror J.C. was a former peace officer and district attorney investigator who had retired 10 years before trial. Voir dire began with his assurances that he could consider and impose either life imprisonment or a death sentence depending upon the evidence, including defendant's character and background. Speaking candidly, J.C. acknowledged that he might "lean" toward the prosecution on guilt because he knew, from past experience, that "the district attorney's office is not going to file a case unless they feel [there] is sufficient evidence to get a conviction." J.C. was familiar with pretrial motions to dismiss complaints and suppress evidence. He assumed the defense might try to disqualify him.

Nevertheless, J.C. insisted that his law enforcement background would not impair his ability to be a fair and impartial juror. He said that he would make his own decision on guilt and penalty based on the evidence and instructions, that he would not automatically vote in favor of the prosecution, that law enforcement officers sometimes make mistakes, that defendant was presumed innocent until proven guilty, and that the prosecution must prove guilt beyond a reasonable doubt. J.C. made clear that he "would want [defendant] to have a fair trial."

Prospective Juror K.E. worked as a customs agent for the federal government in the internal affairs division. Previously, she had worked with both the sheriff's office and university police. She stated on voir dire that her job enhanced, rather than detracted from, her fairness as a juror. K.E. noted that she had encountered "bad" police officers, some of whom had lied to her. She also was trained to assess the credibility of all witnesses. Though K.E. favored the death penalty, she knew it was not appropriate in every case depending on the facts. She also believed that life imprisonment was "horrible," even though it was less serious than death. Later, in response to

defense questioning, K.E. reiterated that she would not feel an affinity toward police witnesses, or a suspicion towards the defense team, if she served on the jury.

Based on these exchanges, and the deference we accord to credibility determinations on voir dire, the trial court could reasonably conclude that neither prospective juror was biased in favor of the prosecution or a death sentence despite their employment backgrounds. Hence, the court did not err in denying defendant's challenges for cause. (See, e.g., *Ledesma, supra*, 39 Cal.4th 641, 675–676 [upholding retention of reserve deputy sheriff who said he could be fair on death penalty, even though friends in law enforcement had been murdered]; *People v. Staten* (2000) 24 Cal.4th 434, 453–454 [101 Cal.Rptr.2d 213, 11 P.3d 968] [same, as to female prospective juror whose close relatives were police officers].)

B. *Denial of Additional Peremptory Challenge*

After the voir dire of Prospective Juror D.N., whom neither side challenged for cause, the prosecutor accepted the jury panel as constituted. At a sidebar conference, defense counsel expressed dissatisfaction "with the 12 that are here." Defense counsel acknowledged that he had exhausted all 20 peremptory challenges allotted by statute. (See Code Civ. Proc., § 231, subd. (a).) However, citing the Sixth and Eighth Amendments, counsel sought an additional peremptory challenge to compensate for the one used against K.E., whom he had unsuccessfully challenged for cause. However, the trial court saw no reason to exercise its discretion in favor of granting the request. (See *People v. Bittaker* (1989) 48 Cal.3d 1046, 1087–1088 [259 Cal.Rptr. 630, 774 P.2d 659].) The court suggested that the defense had used several peremptory challenges against persons who presented "no problem at all in terms of being fair and impartial." According to the court, the defense appeared to have exhausted its peremptories in order to preserve arguments for appeal on the challenges for cause.

Defendant contends the trial court arbitrarily denied his request for an additional peremptory challenge under state law, and thereby violated his federal constitutional rights to due process and an impartial jury under the Sixth, Eighth, and Fourteenth Amendments. (See *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227].) We reject the claim.

To establish a constitutional entitlement to additional peremptory challenges, the defendant must at least show that he is likely to receive an unfair trial before a biased jury if the request is denied. (*People v. Pride* (1992) 3 Cal.4th 195, 231 [10 Cal.Rptr.2d 636, 833 P.2d 643] (*Pride*); accord, *Ledesma, supra*, 39 Cal.4th 641, 665.) Defendant has made no such showing

at trial or on appeal. As explained above, the trial court did not erroneously deny defense challenges for cause against either J.C. or K.E. Nor does defendant identify any allegedly biased jurors who sat on his jury. (*Pride, supra,* 3 Cal.4th at p. 231.) No basis for reversal on this ground appears.

## C. *Cumulative Error and Prejudice*

Defendant claims the errors the trial court allegedly committed in selecting a jury (see discussion, *ante*) combined to deprive him of a fair trial, an impartial jury, and a reliable death judgment under the federal Constitution. For reasons we have explained, no error occurred at this phase of trial. We therefore discern no cumulative prejudicial effect requiring reversal of the judgment.

## IV. PRETRIAL ISSUES

## A. *Speedy Trial Motion*

Defendant contends the 22-month period between "his arrest in Missouri" (Dec. 28, 1989) for crimes committed in that state, and "his being brought to Orange County" (Oct. 18, 1991) to stand trial in the capital case, violated his speedy trial rights under the federal and state Constitutions. The trial court rejected similar claims. We find no error.

After the murder on December 17, 1989, defendant drove the victim's car from Garden Grove to Missouri. There, he committed crimes in two different counties. On December 23, defendant assaulted Lorinda J. in her home in Marionville, which is in Lawrence County, Missouri. On December 28, he used the murder weapon to shoot Officer Robinson in Springfield, which is located in Greene County, Missouri. As we have seen, defendant was arrested and detained in the Greene County jail for the latter crime the same day it occurred.

It appears that sometime in January 1990, the Orange County Public Defender's Office was appointed to represent defendant in anticipation of capital charges being filed for the murder of Nguyen. On February 1, 1990, the Orange County District Attorney's Office filed a complaint charging defendant with that murder, and alleging special circumstances. Within a few months, in June 1990, appointed counsel moved in the capital case to discover, among other things, all physical evidence, including the results of any scientific testing conducted thereon.

Meanwhile, defendant remained in custody in Missouri. In a trial ending May 2, 1990, defendant was convicted of crimes involving the shooting of

Officer Robinson in Greene County. Defendant was subsequently charged with crimes committed against Lorinda J. in Lawrence County. Due to a venue change, the latter case was moved to Berry County, Missouri. Defendant entered a guilty plea on March 6, 1991.

That same month, the Orange County District Attorney's Office sought to return defendant to California to stand trial in the capital case. Interstate transfer documents were sent to Missouri, where defendant was incarcerated, on March 29, 1991. (See § 1389.) For the next several months, defendant fought extradition. Following formal proceedings on the matter, a Missouri court issued an order transferring defendant to the custody of California authorities on September 13, 1991. On October 18, 1991, the transfer occurred and defendant arrived in California.

Arraignment on the pending complaint was originally scheduled for October 21, 1991. However, on two occasions, defendant appeared with counsel in municipal court, and requested continuances. Both times, defendant personally waived his rights to a speedy trial. At the second continuance hearing, however, counsel explained that defendant was not waiving such rights insofar as they attached to time spent in custody in Missouri before arriving in California. On December 6, 1991, defendant was arraigned and pled not guilty to the capital crime as alleged in the complaint.

On February 3, 1992, the preliminary hearing occurred, and defendant was held to answer on capital charges in superior court. The information was filed on February 18, 1992. Defendant was arraigned in superior court the same day.

Before jury selection began, defendant moved to dismiss the charges under the federal and state constitutional speedy trial guarantees, citing the "delay" in bringing him from Missouri to California. Defendant claimed he was available to California authorities the entire time, and that evidence presumably had been lost as a result. The prosecution formally opposed the motion.

At various times over the next month, the court and counsel discussed the motion. The court first heard testimony from Detectives Shave and Overley, from the Garden Grove Police Department, and Sam Phillips, the chief assistant prosecutor from Greene County, Missouri. Their testimony established that California authorities never asked Missouri authorities to release defendant for trial on capital charges, and that Missouri never refused to do so. However, the same witnesses said they had discussed and understood that defendant should be tried first in Missouri because he was already in custody there, and because a noncapital trial in Missouri would proceed much faster than the capital trial in California.

At the next hearing on the speedy trial motion, the court announced that it would defer its ruling at least until the end of the guilt phase. The court explained that, assuming the federal and state constitutional rights to a speedy trial applied, it basically must balance any justification for the challenged delay against any prejudicial effect. (See *Barker v. Wingo* (1972) 407 U.S. 514, 530 [33 L.Ed.2d 101, 92 S.Ct. 2182]; *Jones v. Superior Court* (1970) 3 Cal.3d 734, 740 [91 Cal.Rptr. 578, 478 P.2d 10].) As a threshold matter, time spent bringing defendant to California was justified in the court's view. The court emphasized that defendant faced multiple prosecutions for crimes committed in Missouri, that he was represented by counsel in California while being prosecuted in Missouri, and that neither party "could do much about getting [him] out here" before such proceedings were complete. However, in order to properly assess prejudice, the trial court decided to first hear the evidence at trial. (See *People v. Martinez* (2000) 22 Cal.4th 750, 768–770 [94 Cal.Rptr.2d 381, 996 P.2d 32] (*Martinez*) [approving such practice].)

The speedy trial motion was ultimately denied near the end of the penalty phase. The court found no indication that defendant lost evidence or suffered prejudice between the time of his Missouri arrest and his arrival in California. Any disadvantage was deemed insignificant in light of the overwhelming evidence of guilt.

■ On appeal, defendant first complains about the manner in which the court weighed the relevant factors and determined that no federal constitutional violation occurred. However, contrary to what defendant apparently would have us assume or conclude, the Sixth Amendment's speedy trial provision never applied in the first place. "[B]efore [a] defendant may allege [such] a violation . . . , he must establish the right attaches." (*People v. Roybal* (1998) 19 Cal.4th 481, 513 [79 Cal.Rptr.2d 487, 966 P.2d 521] (*Roybal*); see *id.* at p. 512.) It is settled that, for federal constitutional purposes, attachment of the right to speedy trial occurs only upon " 'either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge.' " (*Martinez, supra,* 22 Cal.4th 750, 755, 760, quoting *United States v. Marion* (1971) 404 U.S. 307, 320 [30 L.Ed.2d 468, 92 S.Ct. 455] (*Marion*).) The filing of a felony complaint does not trigger federal speedy trial protection on the charged crimes. (*Martinez, supra,* 22 Cal.4th at pp. 754–755, 763, 764, 765.) The reason is that the Sixth Amendment requires "formal accusation in the court with jurisdiction over the prosecution of the charge" (*Martinez,* at p. 763), or "arrest with continuing restraint" on such charge. (*Id.* at p. 765; accord, *People v. Horning* (2004) 34 Cal.4th 871, 891 [22 Cal.Rptr.3d 305, 102 P.3d 228] (*Horning*).)

Here, defendant did not stand formally accused or subject to the requisite restraint for Sixth Amendment purposes until February 1992, when he was

held to answer on capital charges and the information was filed in Orange County Superior Court. Such events happened *after* Missouri authorities released defendant to the custody of California authorities, and *after* he arrived in Orange County in October 1991. Hence, the federal speedy trial right did not operate during the preceding 22-month period that began in December 1989, when defendant was arrested, detained, and tried for crimes committed in Missouri—a state that had no jurisdiction to prosecute the capital crime. Nor, for reasons we have explained, was the Sixth Amendment right triggered on February 1, 1990, by the mere filing of the complaint in Orange County Municipal Court. Hence, defendant's federal speedy trial rights were not implicated or violated here.

■ We also reject defendant's state constitutional claim, which involves a somewhat different analysis. (See Cal. Const., art. I, § 15.) Unlike its federal counterpart, the speedy trial guarantee under the state Constitution *is* triggered by the filing of a felony complaint. Hence, such a violation may be premised "on delay occurring after the filing of the complaint and before the defendant was held to answer the charge in superior court." (*Martinez, supra,* 22 Cal.4th 750, 766; accord, *Horning, supra,* 34 Cal.4th 871, 895.) Under this theory, defendant's state constitutional speedy trial rights operated during the 24 months between the time the complaint was filed in February 1990, and the time he was bound over and charged in superior court in February 1992. However, "when a defendant seeks dismissal based on delay after the filing of the complaint and before indictment or holding to answer on felony charges, a court must weigh 'the prejudicial effect of the delay on defendant against any justification for the delay.' [Citations.] No presumption of prejudice arises from delay after the filing of the complaint and before arrest or formal accusation by indictment or information [citation]; rather, the defendant seeking dismissal must affirmatively demonstrate prejudice [citation]." (*Martinez, supra,* 22 Cal.4th at pp. 766–767.)

Defendant has not made such a showing or established trial court error here. First, there was ample justification for not trying defendant on capital charges during the 20-month period between the filing of the complaint (Feb. 1, 1990) and his return to California (Oct. 18, 1991). California authorities showed comity toward Missouri authorities, who had custody of defendant. Defendant faced serious charges in two Missouri counties for the shooting of a police officer and an attempted rape during a home burglary. Within a brief and reasonable time after Missouri finished serially prosecuting defendant for such crimes (Mar. 6, 1991), California decided to seek defendant's return for trial on the capital crime, and sent documents to Missouri for that purpose (Mar. 29, 1991). For the next five months (i.e., until Sept. 13, 1991) defendant unsuccessfully fought such transfer. He came to California in October 1991.

Second, defendant's actions contributed to much of the foregoing delay. He fled California after the capital crime, committed new crimes in Missouri, caused Missouri authorities to prosecute him, and compelled California authorities to extradite him. Many of these actions seem "far more blame-worthy than [the] government-caused delay" about which defendant now complains. (*Horning, supra,* 34 Cal.4th 871, 894; see *id.* at p. 895 [finding no federal or state constitutional speedy trial violation under similar circumstances].)

Third, defendant suffered no prejudice during the four-month period not attributable to crimes and proceedings in Missouri, i.e., between arriving in California (Oct. 1991) and being held to answer and charged in superior court (Feb. 1992). For this reason, perhaps, defendant has not included this period in the speedy trial claims raised at trial or on appeal. Indeed, he expressly waived his speedy trial rights when seeking to *postpone* arraignment on the complaint for almost two months after first appearing in Orange County Municipal Court (i.e., from Oct. 21, 1991 to Dec. 6, 1991).

Moreover, contrary to what defendant suggests, no evidence was lost after defendant returned to California that limited his ability to defend against the shoe print/crime scene testimony or the fingerprint/stolen car evidence. Counsel began formal discovery proceedings long before defendant returned to California from Missouri. Such efforts continued through trial, especially with respect to the partial Nike shoe prints that Criminalist Krenz found at the crime scene. As discussed further below, no part of the prosecutorial delay allowed the Nike company to dispose of sales records showing that his shoes were widely available in Garden Grove in 1989, or prevented him from minimizing the weight of Krenz's testimony. Rather, Nike did not *start* keeping such records until 1990, *after* the capital crime. Likewise, the relevant delay *postdated* the loss of Nguyen's car following its inadvertent release from police custody on January 12, 1990, shortly after defendant was arrested in Missouri. As we discuss below, the Toyota MR2 was tested by the police, the results were made available to the defense, and no evidence seems to have been lost as a result. Accordingly, as with his federal claim, we find no violation of defendant's state constitutional speedy trial rights.[7]

---

[7] Defendant notes in his reply brief that prosecutorial delay in bringing criminal charges may implicate federal *due process* guarantees. We reject any suggestion that such a violation occurred here. To warrant dismissal of the case on due process grounds, existing law requires a showing that the state's conduct in deferring prosecution "deviate[d] from 'fundamental conceptions of justice' " (*United States v. Lovasco* (1977) 431 U.S. 783, 790–791 [52 L.Ed.2d 752, 97 S.Ct. 2044]), and that the ability to mount a defense has thereby suffered "substantial prejudice." (*Marion, supra,* 404 U.S. 307, 324; see *Lovasco, supra,* at pp. 790–791.) Here, defendant has not shown that any delay attributable to the prosecution—delay intended only to

## B. *Statements to Police*

Defendant argues the trial court erred in ruling that, if he testified, he could be impeached with statements he made to California detectives about the capital crime while jailed in Missouri for crimes committed there. He claims here, as in his suppression motion below, that such statements were not admissible for any purpose because they violated the Fifth Amendment privilege against self-incrimination (see *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*)), the Sixth Amendment right to counsel, the due process ban on coerced confessions under the Fourteenth Amendment, and parallel provisions of the state Constitution. Defendant did not testify, and the Missouri statements were not introduced for any purpose. Nonetheless, he claims the court's erroneous "impeachment" ruling prevented him from taking the stand. (See, e.g., *People v. Jablonski* (2006) 37 Cal.4th 774, 813 [38 Cal.Rptr.3d 98, 126 P.3d 938] (*Jablonski*).) We will reject the claim.

### 1. *Background*

Detective Shave, who led the murder investigation for the Garden Grove Police Department, was a key witness at the suppression hearing. He testified as follows: On January 8, 1990, Shave and his partner, Detective Glenn Overley, arrived at the Greene County jail in Springfield, Missouri to interview defendant. They were unarmed. A jailer told the detectives that defendant was not represented by counsel, and that a female lawyer might visit him the next day. Detectives also learned that the jail did not allow tape recorders inside. This circumstance led Shave to describe the interview as "off record" in his handwritten notes. The notation did not reflect anything said to defendant during the interview.

Shave further testified that he and Overley waited for defendant in an interview room with a table and three chairs. The air temperature was comfortable. The door, which locked from the hallway outside, had a window in it. Defendant wore no restraints when escorted into the room and while seated in his chair. There was nothing unusual about his appearance, and he did not complain about his physical condition. The trio was left alone knowing that jail personnel would check on them periodically and unlock the door when the interview ended.

According to Detective Shave, defendant learned that Shave and Overley were California police officers, that they wanted to ask some questions, and

allow a sister jurisdiction to complete its own criminal proceedings—violated such fundamental concepts. Nor, for reasons we have explained, has he shown actual prejudice. (See, e.g., *Horning, supra*, 34 Cal.4th 871, 895.)

that they needed to advise defendant of his *Miranda* rights. However, before Shave could take a breath and read out loud from the *Miranda* card in his hand, defendant blurted out that counsel from California—"Mr. Alexander"— had told him not to talk. Defendant also said that his mother, who had spoken to Mr. Alexander, called defendant and told him not to talk. Shave acknowledged that defendant was not waiving his *Miranda* rights. Shave then put the card away, closed his notebook, and waited for the door to open.

After a period of silence, Shave said, "Well, you understand that this can't be used in the case-in-chief against you." Defendant replied, "Yeah, it's been in the paper all over, rape and murder in California in Garden Grove"—a topic and place that Shave had never mentioned. Shave testified that they then chatted about defendant's family and military service. When defendant volunteered that he wanted to be a mercenary, Shave asked whether a mercenary carried a .25-caliber firearm. Defendant said that such a small caliber gun "could kill just as well as any other gun." In response to Shave's questions about "the gun," defendant talked about buying it cheaply in San Bernardino "before the girl in Garden Grove was murdered." Defendant denied receiving any money from his uncle or visiting Lake Arrowhead. When asked about "having the car that night," defendant mentioned his trip to Missouri and good gas mileage.

Upon further questioning, defendant said he was "bother[ed]" by having shot the girl in Garden Grove, and that he could not explain his "violent" acts toward women. Shave testified that both he and defendant spoke in soft tones, especially about the shooting. Defendant admitted being alone while walking in the shopping center and shooting the victim. He denied removing her pants and said he left her clothed in the dumpster area. He admitted using her credit card.

Detective Shave described other topics that he and defendant discussed. Defendant expressed concern about reentering prison with a "rape jacket" because it would restrict his work privileges and movements. He denied sexually assaulting anybody on Erin Street in Garden Grove or in Lawrence County, Missouri. However, he admitted shooting a Springfield police officer in order to avoid being returned to prison. Defendant preferred being incarcerated in Missouri near his family.

Defendant did not answer certain questions. Such topics concerned what he meant by "violent" behavior toward women, how he knew that the girl he shot owned the car he drove to Missouri, whether the shooting victim was raped, how she first came to his attention in the shopping center, and what prompted the shooting. Shave testified that the interview reached a "natural conclusion" after 45 minutes.

In response to defense questioning at the suppression hearing, Detective Shave acknowledged that he knew at the time of the interview that statements obtained in violation of *Miranda* and inadmissible in the prosecution's case-in-chief might be admissible "on rebuttal." Detective Shave testified that he raised the "case-in-chief" concept hoping defendant would talk with the officers. However, this tactic apparently was not discussed beforehand in a meeting Shave and Overley had with someone in the prosecutor's office about defendant's case.

Detective Overley also testified at the suppression hearing. He recalled being caught "off guard" by defendant's initial refusal to answer any questions based on Attorney Alexander's advice. According to Overley, no charges were pending against defendant in Orange County at the time, and detectives did not know how or why California counsel had become involved. Overley recalled that neither he nor Detective Shave elaborated on the comment that defendant's statements could not be used in the "case-in-chief." Consistent with Shave's account, Overley testified that defendant was never told that his statements were "off the record." Overley confirmed that tape recorders were banned from the Springfield jail.

The final witness at the suppression hearing was Roger Alexander, a deputy public defender in Orange County. Alexander testified that on December 29, 1989, after speaking by phone with defendant's mother and reading news accounts of the Garden Grove murder, Alexander initiated a phone conversation with defendant at the Springfield jail. During that call, defendant said he was indigent and wanted to be represented by Alexander's office in the present case. However, it was only at a later point that such an appointment was made and charges were filed. Alexander advised defendant of his *Miranda* rights, and told him to request counsel and remain silent. Alexander warned defendant that "the officers would continue to question him," and that he should continue invoking his rights even if they said his statements "could not be used against him."

After hearing argument on both sides, the trial court granted, in part, and denied, in part, defendant's motion to exclude his statements at trial. The court first ruled that defendant invoked his *Miranda* rights, that subsequent questioning violated such rights, and that defendant's statements could not be used to prove guilt in the prosecution's case-in-chief.

However, following *Harris v. New York* (1971) 401 U.S. 222, 224 [28 L.Ed.2d 1, 91 S.Ct. 643] (*Harris*), the trial court concluded that defendant's statements, which it found were not coerced or involuntary for due process purposes, could be used to impeach his credibility if he testified. In rejecting defendant's involuntariness claim, the trial court relied on numerous

factors. They related primarily to Detective Shave's conduct of the interview (e.g., his brevity and subdued manner), and defendant's response (e.g., his understanding of the right to silence and counsel, his apparent lack of confusion about statements being omitted from the "case-in-chief," and his decision to answer only certain questions). Finally, no violation of the Sixth Amendment right to counsel was found. The trial court reasoned that defendant did not acquire such right in the capital case until several weeks *after* the police interview, on February 1, 1990, when the complaint was filed.

Four days after the ruling on the suppression motion, defendant personally waived his right to testify. He did not take the stand at either the guilt or penalty phase.

### 2. *Analysis*

■ Defendant first contends the trial court erred in allowing use of his statements for impeachment because detectives conducted a custodial interrogation in knowing violation of *Miranda, supra,* 384 U.S. 436, and ignored the right to silence and counsel he invoked thereunder. Defendant recognizes that his *Miranda* claim fails under *People v. Peevy* (1998) 17 Cal.4th 1184, 1191–1202 [73 Cal.Rptr.2d 865, 953 P.2d 1212] (*Peevy*), which was decided after the instant suppression ruling. *Peevy* held that a statement deliberately obtained in violation of *Miranda* safeguards, but otherwise voluntary, is admissible for impeachment under *Harris, supra,* 401 U.S. 222, 224.[8] Defendant insists, however, that *Peevy* is no longer viable and should be reconsidered in light of the subsequent decision in *Dickerson v. United States* (2000) 530 U.S. 428 [120 S.Ct. 2326, 147 L.Ed.2d 405] (*Dickerson*).

We have previously rejected a similar claim (*People v. Demetrulias* (2006) 39 Cal.4th 1, 29–30 [45 Cal.Rptr.3d 407, 137 P.3d 229]), and do so again here. The narrow question in *Dickerson, supra,* 530 U.S. 428, concerned congressional authority to effectively overrule *Miranda, supra,* 384 U.S. 436. To this end, *Dickerson* held that the *Miranda* decision is "constitutionally based" and could not be abrogated by statute. (*Dickerson, supra,* 530 U.S. at p. 440.) The high court observed that certain exceptions, including the impeachment principles in *Harris, supra,* 401 U.S. 222, demonstrated "not that *Miranda* is not a constitutional rule—but that no constitutional rule is

---

[8] In *Peevy, supra,* 17 Cal.4th 1184, which followed *Harris, supra,* 401 U.S. 222, we reasoned that barring statements taken in violation of the *Miranda* rule *both* to prove guilt *and* for impeachment would give unfair advantage to testifying defendants, and provide little additional deterrence of police misconduct. In particular, " '[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.' " (*Peevy, supra,* 17 Cal.4th at p. 1194, quoting *Harris, supra,* 401 U.S. at p. 226.)

immutable." (*Dickerson, supra,* 530 U.S. at p. 441.) Nothing in *Dickerson* indicated that the court's careful balancing of the parameters of the *Miranda* rule had changed. Thus, defendant has not shown that *Dickerson* is inconsistent with *Harris, supra,* 401 U.S. 222, or *Peevy, supra,* 17 Cal.4th 1184.

Defendant next faults the trial court for allowing impeachment with statements obtained in violation of his Sixth Amendment right to counsel. Detectives allegedly interfered with a "preexisting" attorney-client relationship when they discussed the capital crime with defendant after learning that Attorney Alexander had told him not to do so. As we now explain, the asserted right never arose and could not have been violated in the present case.

■ A criminal defendant's right to the assistance of counsel under the Sixth Amendment does not exist until the state initiates adversary judicial criminal proceedings, such as by formal charge or indictment. Hence, an uncharged suspect undergoing police questioning possesses no such Sixth Amendment right. (*Davis v. United States* (1994) 512 U.S. 452, 456–457 [129 L.Ed.2d 362, 114 S.Ct. 2350]; *People v. Frye* (1998) 18 Cal.4th 894, 987 [77 Cal.Rptr.2d 25, 959 P.2d 183]; see *Patterson v. Illinois* (1988) 487 U.S. 285, 290–297 [101 L.Ed.2d 261, 108 S.Ct. 2389] [noting that defendant subject to postindictment interrogation must invoke 6th Amend. right, and describing circumstances under which it can be waived].)

Moreover, the Sixth Amendment right to counsel is "offense specific"; it arises and may be asserted only as to those offenses for which criminal proceedings have formally begun. (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 175 [115 L.Ed.2d 158, 111 S.Ct. 2204]; see *People v. Webb* (1993) 6 Cal.4th 494, 527 [24 Cal.Rptr.2d 779, 862 P.2d 779] (*Webb*).) A defendant's incriminating statements about offenses for which he has not been charged may be admitted consistently with his Sixth Amendment counsel guarantee notwithstanding its attachment on other charged offenses at the time. (*McNeil v. Wisconsin, supra,* 501 U.S. at p. 176; *Webb, supra,* 6 Cal.4th at p. 527.) "[T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities." (*Maine v. Moulton* (1985) 474 U.S. 159, 180 [88 L.Ed.2d 481, 106 S.Ct. 477]; see *Texas v. Cobb* (2001) 532 U.S. 162, 167–173 [149 L.Ed.2d 321, 121 S.Ct. 1335] [reaffirming and defining offense-specific nature of right; *People v. Slayton* (2001) 26 Cal.4th 1076, 1081–1085 [112 Cal.Rptr.2d 561, 32 P.3d 1073] [same].)

■ The foregoing authorities defeat any Sixth Amendment bar to eliciting and admitting defendant's statements about the capital crime. At the time of

the interview, defendant had been arrested and jailed in Missouri following the shooting of Officer Robinson. Defendant learned over the phone from Attorney Alexander that he need not, and should not, discuss the California crimes in counsel's absence no matter what assurances the police gave about their use. Even assuming that criminal proceedings had begun on the Missouri crimes for which defendant was in custody, and that his Sixth Amendment right to counsel had attached to *those* counts, similar circumstances did not exist with respect to the California murder and related offenses. As noted by the trial court, formal charges were not pending in the present case at the time of the police interview. Defendant cites no authority requiring or persuading us to ignore the bright-line precharging rule against attachment of a Sixth Amendment right in the present case simply because counsel may have fortuitously intervened beforehand.[9]

In his final attack on the trial court's ruling, defendant contends his statements were coerced and involuntary, and were inadmissible for any purpose under due process guarantees. The claim rests primarily on uncontradicted evidence that, after defendant spontaneously invoked his *Miranda* rights, Detective Shave mentioned the inadmissibility of defendant's statements in the "case-in-chief," but never explained the scope of that exclusionary rule or the impeachment exception. Allegedly, these circumstances so misled defendant about the legal risks of the interview that he could not resist the impulse to participate.

█ The due process clause of the Fourteenth Amendment precludes the admission of any involuntary statement obtained from a criminal suspect through state compulsion. (*Dickerson, supra*, 530 U.S. 428, 433–434; *Colorado v. Connelly* (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 107 S.Ct. 515]; *People v. Neal* (2003) 31 Cal.4th 63, 79 [1 Cal.Rptr.3d 650, 72 P.3d 280].) Involuntariness means the defendant's free will was overborne. (*Dickerson, supra*, at p. 434; *People v. Guerra* (2006) 37 Cal.4th 1067, 1093 [40 Cal.Rptr.3d 118, 129 P.3d 321] (*Guerra*).) Whether the defendant lost his

---

[9] Defendant cites *Escobedo v. Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], for the notion that his Sixth Amendment right to counsel arose "even before indictment" in the present case. This approach is flawed for reasons we have previously explained. (*Webb, supra*, 6 Cal.4th 494, 528, fn. 24.) Specifically, *Escobedo* purported to recognize a preindictment right to counsel where the criminal investigation "has begun to focus on a particular suspect" who makes incriminating statements to police. (*Escobedo, supra*, 378 U.S. at pp. 490–491.) Despite contrary language in *Escobedo* itself (see *id.* at p. 491), *Miranda* later made clear (*Miranda, supra*, 384 U.S. 436, 440–442, 444 & fn. 4), that *both* cases are concerned solely with prophylactic measures available to suspects undergoing custodial interrogation, including the right to counsel, and that such safeguards help protect the *Fifth* Amendment privilege against self-incrimination at trial. (Accord, *Moran v. Burbine* (1986) 475 U.S. 412, 429 [89 L.Ed.2d 410, 106 S.Ct. 1135].) "Hence, *Escobedo* does not support defendant's claim that his Sixth Amendment right to counsel was violated, nor does it give rise to any Fifth Amendment claim not otherwise available under *Miranda*." (*Webb, supra*, 6 Cal.4th at p. 528, fn. 24.)

free will and made involuntary statements does not rest on any one fact, however significant it may seem. Instead, courts examine the totality of the circumstances. (*Withrow v. Williams* (1993) 507 U.S. 680, 688–689 [123 L.Ed.2d 407, 113 S.Ct. 1745]; *Jablonski, supra,* 37 Cal.4th 774, 814.) While the reviewing court independently decides whether the statements were involuntary, it accepts the trial court's factual findings if supported by substantial evidence. (*Guerra, supra,* 37 Cal.4th at p. 1093; *Jablonski, supra,* 37 Cal.4th at p. 814.)

The factors supporting the trial court's voluntariness decision are stronger here than in other cases in which similar findings have been made. Though defendant sidesteps the point, he was not worn down by a lengthy interrogation or deprived of human comforts or necessities. The interview lasted only 45 minutes as opposed to several hours. (Cf. *Jablonski, supra,* 37 Cal.4th 774, 815.) It occurred while defendant sat unrestrained in a climate-controlled room. He did not complain about a lack of sleep or food, or suffer any physical ailments. (Cf. *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 60–61 [17 Cal.Rptr.3d 710, 96 P.3d 30] (*Coffman and Marlow*); *People v. Storm* (2002) 28 Cal.4th 1007, 1036 [124 Cal.Rptr.2d 110, 52 P.3d 52].) Nor does the record reveal anything harsh or overtly threatening about the tone or content of questioning. (Cf. *Guerra, supra,* 37 Cal.4th 1067, 1095; *Coffman and Marlow, supra,* 34 Cal.4th at p. 61.) Indeed, the trial court described Detective Shave as naturally soft-spoken in court. Defendant seemed so relaxed that he engaged in what Overley described as "small talk" about his life.

Contrary to what defendant implies, neither the failure to read defendant his *Miranda* rights, nor the continued interrogation after he asserted such rights, compels a finding of official coercion. (*Jablonski, supra,* 37 Cal.4th 774, 814, citing *People v. Bradford* (1997) 14 Cal.4th 1005, 1039 [60 Cal.Rptr.2d 225, 929 P.2d 544].) We have reached a similar conclusion where the number of times the police ignored the defendant's request for counsel far exceeded what happened here. (See *Jablonski, supra,* 37 Cal.4th at pp. 810, 814–815 [11 times]; *Coffman and Marlow, supra,* 34 Cal.4th 1, 57–58 [nine times].) Defendant's prior experience as a felony suspect and the advice he received from both his mother and Attorney Alexander suggest he was not confused or intimidated by detectives, and that he willingly chose to unburden himself about the capital crime.

Of course, Detective Shave's assurance that defendant's statements could not be used in the "case-in-chief" was only true as far as it went; he did not specifically mention the converse principle that such statements might be used for impeachment. However, there is no evidence that defendant, a convicted felon, did not understand Shave's point, or that detectives otherwise mischaracterized the interview as wholly "off the record." In any event,

prior cases have consistently rejected involuntariness claims even where police representations on admissibility were much less accurate than the one made here. (*Jablonski, supra,* 37 Cal.4th 774, 811, 815 [unqualified assurance that defendant's statements could not be used in court]; *Coffman and Marlow, supra,* 34 Cal.4th 1, 54, 58 [same]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1132–1133 [124 Cal.Rptr.2d 373, 52 P.3d 572] (*Gutierrez*) [unqualified assurance that defendant's statements would not be used in court].) As evidence that nothing detectives said rendered defendant's statements involuntary, he fielded their questions in a careful matter, and declined to discuss certain sensitive topics that they raised. "His resistance, far from reflecting a will overborne by official coercion, suggests instead a still operative ability to calculate his self-interest in choosing whether to disclose or withhold information." (*Coffman and Marlow, supra,* 34 Cal.4th at p. 58.)

In sum, we find no error in the suppression and impeachment ruling below.

V. GUILT ISSUES

A. *Shoe Print Evidence*

According to defendant, the trial court mishandled shoe print evidence introduced through Criminalist Krenz—evidence that the prosecution acquired and disclosed to the defense shortly before trial. Defendant complains about the denial of various motions (i.e., continuance, mistrial, exclusion of evidence) on grounds the prosecutor violated rules regulating both pretrial discovery (§ 1054 et seq.) and the reliability of scientific evidence. (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*).) Here, as below, constitutional violations are alleged (i.e., right to due process, to counsel, and to prepare and present a defense). We will reject the claims.

1. *Background*

The basic facts came to light during discussions between the court and counsel about Krenz's testimony. Several months before the jury was sworn, Krenz had examined paper debris recovered from the crime scene, found no shoe prints linked to defendant, and prepared a report of her findings that both parties received. A defense expert, Steve Schliebe, examined the same physical items, and reached similar conclusions.

The day after the jury was sworn, and before opening statements were made, defendant filed his written offer of proof on the admissibility of third party culpability evidence. Apparently, in an abundance of caution, the trial court had previously granted a defense request to delay presentation of this theory until the eve of trial to avoid giving the prosecution too much advance

warning. The offer of proof referred, among other things, to "numerous" shoe prints at the crime scene that could not be linked to defendant or any other known person. According to the prosecutor, this representation differed from his recollection that only a *few* unidentified shoe prints had been found. Hence, that same night, the prosecutor and Krenz spent six hours examining debris that had been taken from the floor of the dumpster alcove, looking for shoe prints they might have missed before.

As a result, Krenz found two new partial shoe prints that appeared to be consistent with defendant's Nike shoes. Krenz reached this conclusion in each case by making an imprint of the bottom of defendant's shoe on a transparent plastic sheet, attaching a photograph of the crime scene shoe print underneath the transparency, and laying the transparency over the photograph to see if the sole patterns lined up.[10]

Counsel complained that the foregoing evidence surprised the defense, and violated the prosecution's duty to provide discovery in a timely fashion. Counsel sought to investigate the matter to determine the likelihood that the disputed shoe prints were made by defendant, and to retain another expert to examine Krenz's new conclusions in this regard. Counsel asked for a continuance, and for a mistrial if the continuance was denied. He moved, alternatively, to exclude Krenz's testimony and related exhibits (i.e., shoe print transparencies and attached photographs).

The prosecutor denied any wrongdoing, and insisted he had no choice but to reexamine the crime scene debris when counsel suggested that it contained numerous exculpatory shoe prints. The prosecutor emphasized that all such evidence had been given to the defense and examined by their expert long before trial. To ease counsel's concerns, the prosecutor offered to recess for one week before presenting any evidence, and/or to present Krenz's testimony at the end of the case-in-chief. The prosecutor also offered to stipulate to any evidence concerning the number of Nike shoes like defendant's in Garden Grove near the time of the crime.

The trial court agreed that defendant was entitled to fully investigate Krenz's proffered testimony, and that the defense should suffer no prejudice from the timing of its disclosure. However, the court saw no discovery violation or unfairness requiring either a continuance or mistrial, or exclusion of the shoe print evidence. According to the court, nothing in its pretrial

---

[10] Defendant calls this shoe print comparison process the "acetate overlay" method. Krenz described it in more colloquial terms at trial, as follows: "[The transparency] was made by dusting the bottom of a shoe and then putting some sticky white paper over it and pulling it off. Then we use a copy machine to make a transparency. The bottom of—the underneath is a photograph that I took of a partial shoe impression [from debris at the crime scene]."

discovery order or applicable law constituted "an absolute bar to something new coming up during trial."[11] The court credited the prosecutor's account about discovering the two partial shoe prints the night before. In the court's view, defendant could pursue his investigation while trial was underway, because he had two public defenders and access to investigators in their office. The final ruling was issued only after the court heard Krenz's testimony outside the jury's presence describing her shoe print comparison technique.

### 2. Analysis

■ Contrary to what defendant first claims, the discovery statutes did not "mandat[e]" a continuance or other sanction in the present case. The prosecutor must disclose to the defense relevant written, recorded, or reported statements "of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case," as well as "the results of . . . scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial." (§ 1054.1, subd. (f).) Such disclosure generally must occur at least 30 days before trial. (§ 1054.7.) However, the latter provision contains the following exception: "If the material and information becomes known to, or comes into the possession of, a party *within 30 days of trial, disclosure shall be made immediately* . . . ." (*Ibid.*, italics added.)

The trial court properly found that Krenz's testimony and supporting exhibits constituted new evidence, and that disclosure timely occurred under the latter provision. The prosecutor informed both the court and counsel of such evidence immediately after he acquired it. Nothing in the record suggests such acquisition was unreasonably delayed. Indeed, experts on both sides initially overlooked the two new shoe prints, which were found on scraps of paper salvaged from debris in the dumpster alcove. The court accepted the prosecutor's explanation about reexamining the debris and discovering the new shoe prints overnight. We find no violation of the relevant statutes or the court's pretrial order. (See, e.g., *People v. Panah* (2005) 35 Cal.4th 395, 459–460 [25 Cal.Rptr.3d 672, 107 P.3d 790] (*Panah*) [reaching similar conclusion as to new report that pathologist prepared on eve of testimony after reexamining microscopic slides at prosecutor's request].)

We reject defendant's related claim that the trial court abused its discretion in denying his request for a continuance, and in not first ascertaining the

---

[11] The court's pretrial discovery order tracked the language of section 1054.1, part of the criminal reciprocal discovery statute (see discussion, *post*). The order required the prosecutor to disclose, among other things, "[a]ll relevant real evidence seized or obtained" in the case, and the "reports" of expert witnesses, including the results of "scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial."

precise extent of the delay involved. (See *Panah, supra,* 35 Cal.4th 395, 460 [upholding outright denial of continuance of "unspecified length"].) Neither the prosecutor nor the court sought to deny defendant an opportunity to investigate the shoe print evidence or to defend against it. The record supports the court's determination that defendant had ample time and resources to do so after trial began.[12] Under the circumstances, the court could properly find no good cause for delaying the start of trial. (*People v. Wilson* (2005) 36 Cal.4th 309, 352 [30 Cal.Rptr.3d 513, 114 P.3d 758].)

Taking a different tack, defendant argues that the shoe print evidence offered through Krenz was inadmissible under *Kelly, supra,* 17 Cal.3d 24. (See *People v. Leahy* (1994) 8 Cal.4th 587, 593–604 [34 Cal.Rptr.2d 663, 882 P.2d 321] [reaffirming *Kelly* rule despite subsequent changes in analogous federal law].) *Kelly, supra,* at page 30, and its progeny require a showing that new scientific techniques used to detect or analyze evidence have achieved general acceptance in the relevant scientific community. (*Pride, supra,* 3 Cal.4th 195, 238.) This approach prevents lay jurors from being influenced by procedures that carry a false aura of scientific infallibility. (*Webb, supra,* 6 Cal.4th 494, 524, citing *People v. Stoll* (1989) 49 Cal.3d 1136, 1156 [265 Cal.Rptr. 111, 783 P.2d 698].)

The Attorney General correctly argues that defendant has forfeited this specific claim by not raising it in the trial court. (See Evid. Code, § 353.) We apply this procedural bar despite defendant's insistence that the *Kelly* rule is too "important" to avoid applying on the merits in a capital case. (See, e.g., *People v. Diaz* (1992) 3 Cal.4th 495, 527 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

 In any event, we disagree with defendant that trial counsel rendered deficient representation by failing to make a *Kelly* objection. The jury heard Krenz describe her "overlay" technique, and saw the items she used to compare defendant's shoe print (i.e., the transparency) with each crime scene specimen (i.e., photograph). Jurors could judge for themselves whether the

---

[12] Several days before Krenz described her shoe print comparison technique for the jury, defense counsel filed a declaration regarding "Preparation for Shoeprint Evidence." This document summarized the investigative steps the defense took during trial to determine whether a company other than Nike could have produced the shoes that made the two new partial prints, and whether Nikes similar to defendant's shoes were widely disseminated in Garden Grove in December 1989. Defense counsel declared that "specific sales records were not kept by Nike until late in 1990"—after the capital crime. We note that defendant has argued both at trial and on appeal that he needed more time to investigate such matters before Krenz's testimony. Hence, we see no basis for the Attorney General's suggestion that defendant is improperly arguing for the first time on appeal that he needed a continuance to investigate "the frequency of his shoe size in the male population"—a circumstance logically encompassed within the defense motion and investigation in the trial court.

sole patterns on these items looked the same. "Where, as here, a procedure isolates physical evidence whose existence, appearance, nature, and meaning are obvious to the senses of a layperson, the reliability of the process in producing that result is equally apparent and need not be debated under the standards of *Kelly, supra,* 17 Cal.3d 24." (*Webb, supra,* 6 Cal.4th 494, 524; accord, *People v. Farnam* (2002) 28 Cal.4th 107, 159–160 [121 Cal.Rptr.2d 106, 47 P.3d 988] (*Farnam*) [fingerprint comparison]; *People v. Ayala* (2000) 24 Cal.4th 243, 280–281 [99 Cal.Rptr.2d 532, 6 P.3d 193] [bullet comparison].) Because the shoe print evidence did not implicate the concerns underlying the *Kelly* rule, counsel had no duty to object on that ground, and could properly decline to do so.

For all these reasons, we find no judicial error or professional incompetence involving the shoe print testimony and exhibits admitted against defendant.

### B. *Loss of Victim's Car*

Defendant claims here, much as he did below, that the prosecution's failure to preserve and disclose evidence (i.e., Nguyen's car), and the trial court's refusal to specially instruct on the issue, violated due process under the federal and state Constitutions. No error occurred.

In response to defense questions at trial, Detective Shave testified that Criminalist MacWillie met Shave in Missouri to examine Nguyen's Toyota MR2. The examination occurred on January 9, 1990, about two weeks after defendant's arrest, and three weeks before the criminal complaint was filed. The car was photographed inside and out. In addition, police searched for fingerprints and other forensic evidence by examining the car's exterior, interior, engine, and trunk. The car was released from police custody on January 12, 1990, before being examined by anyone acting on defendant's behalf. The circumstances surrounding this development are unclear. Shave testified that he did not authorize the car's release. Counsel suggested during this line of questioning that an insurance company claimed Nguyen's car.

As noted earlier, MacWillie's examination of the Toyota MR2 led to the admission of fingerprint evidence against defendant. His expert witness, Hensgen, agreed with MacWillie in all major respects. In doing so, Hensgen used the fingerprint specimens that MacWillie had lifted from the car and saved for examination. Hensgen indicated that while it would have been ideal for him to have lifted the prints himself, such circumstance never happens when working for the defense. Nothing in Hensgen's testimony suggested that his assessment of the fingerprint evidence had been adversely affected as a result.

During discussions between the court and counsel, the defense offered three special instructions "in the alternative" to address the state's failure to preserve certain items of evidence not relevant here. Almost as an afterthought, the defense team also complained about Nguyen's missing car, and the inability to examine it themselves. The prosecutor indicated that the car was released only after extensive testing, and that the results were timely disclosed to the defense. Defense counsel did not disagree. He argued, however, that, without access to the car, he did not know whether the prosecution's testing was as complete as it seemed.[13]

The instructional request was denied. The trial court found no basis on which to conclude that material exculpatory evidence had been lost or suppressed in violation of due process principles, as discussed further below. The court also found no bad faith in police handling of the car.

On appeal, defendant again faults the prosecution for not retaining Nguyen's car, because it contained three unidentified fingerprints that could have been made by "Denny"—the person who supposedly killed Nguyen and stole her car. Defendant argues that further testing might have revealed fingerprints inculpating such third party, or confirmed that the car contained no blood, hair, or other trace evidence linking defendant to the capital crime. According to defendant, the judgment must be reversed because the court failed to find a constitutional violation and, "[a]t a minimum," to give the curative instructions he sought.

The relevant due process principles have been discussed many times before. (See, e.g., *People v. Carter* (2005) 36 Cal.4th 1215, 1246 [32 Cal.Rptr.3d 838, 117 P.3d 544]; *Farnam, supra,* 28 Cal.4th 107, 166; *Roybal, supra,* 19 Cal.4th 481, 509–510; *Webb, supra,* 6 Cal.4th 494, 519.) Law enforcement agencies must preserve evidence only if it possesses exculpatory value "apparent before [it] was destroyed," and not obtainable "by other reasonably available means." (*California v. Trombetta* (1984) 467 U.S. 479,

---

[13] The three defense instructions at issue here were Nos. 8, 8(a), and 8(b). Instruction No. 8 provided as follows: "If you find that the State collected material evidence during the investigation of this case, and then failed to preserve said evidence, any reasonable inference to be drawn from said failure to preserve should go to the defendant's benefit. [¶] You may find that said evidence, had it been preserved, would have tended to exculpate the defendant." Instruction No. 8(a) provided as follows: "If you find that the State collected material evidence during the investigation of this case, and then failed to preserve said evidence, any reasonable inference to be drawn from said failure to preserve should go to the defendant's benefit. [¶] You should find that said evidence, had it been preserved, would have tended to exculpate defendant." Instruction No. 8(b) provided as follows: "If you find that the State collected material evidence during the investigation of this case, and then failed to preserve said evidence, any reasonable inference to be drawn from said failure to preserve should go to the defendant's benefit." The defense requested and then withdrew a fourth similar instruction, labeled No. 7.

489 [81 L.Ed.2d 413, 104 S.Ct. 2528]; cf. *Brady v. Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 83 S.Ct. 1194] [prosecutorial duty to disclose evidence that is both "favorable" and "material" to the defense].) The state's responsibility is further limited when the defendant challenges the failure to preserve evidence "of which no more can be said than that it could have been subjected to tests" that might have helped the defense. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57 [102 L.Ed.2d 281, 109 S.Ct. 333] (*Youngblood*).) In such a case, unless the defendant can show "bad faith" by the police, failure to preserve "potentially useful evidence" does not violate his due process rights. (*Id.* at p. 58.)

We see no constitutional violation. Defendant stipulated to being in the possession of the murder victim's car in Missouri. The evidence also disclosed that he tried to disguise and hide the vehicle after attracting the attention of Missouri police. Consistent with the suspicions of Garden Grove police, most of the fingerprints that MacWillie found inside the car, and which the killer presumably left there, belonged to defendant. Contrary to what defendant argues, neither MacWillie nor her defense counterpart, Hensgen, could say that the three unidentified fingerprints found in the driver's compartment necessarily belonged to anyone other than defendant or the victim. Thus, the trial court properly concluded that the car had no discernible value favoring the defense before it disappeared. The three disputed fingerprints "may or may not have been defendant's and may or may not have been the perpetrator's." (*Roybal, supra*, 19 Cal.4th 481, 510 [police lost crime scene evidence bearing unidentified fingerprint].)

For similar reasons, defendant cannot show bad faith, i.e., that "the police knew [the car] would have exculpated him" when it was released. (*Youngblood, supra*, 488 U.S. 51, 56, fn. *.) The record discloses that the prosecution scoured Nguyen's car for trace evidence, and provided the results of that examination to the defense. Defendant has not argued at trial or on appeal that the prosecution failed to conduct necessary tests or performed any testing in a deficient manner. Rather, he claims only that the prosecution should have preserved the car from which forensic test results were obtained. Even assuming negligence on the prosecution's part, no more can be said than that the car could have been subjected to further testing by the defense. Accordingly, no due process violation occurred, and no basis for giving defense instructions on the issue arose at trial.

C. *Detective Overley's Testimony*

Consistent with what he argued below, defendant claims that restrictions on his examination of Detective Overley violated state law rules governing "third party culpability" evidence. (See *People v. Hall* (1986) 41 Cal.3d 826

[226 Cal.Rptr. 112, 718 P.2d 99] (*Hall*).) The trial court's ruling allegedly resulted in the denial of his right to due process and to present a defense under the federal and state Constitutions. We disagree.

As background, the defense filed a written offer of proof shortly before opening statements asserting that someone named "Denny" committed the capital crime, and that defendant acquired the murder weapon and Nguyen's stolen property from Denny afterwards. (See discussion, fn. 5, *ante.*) The court and counsel repeatedly debated the permissible scope of defense efforts to present this third party theory to the jury. For instance, the prosecution sought to bar reference to the theory in opening statements absent some showing it could be proved. After a long discussion, in which the trial court warned that defense evidence would have to satisfy *Hall, supra*, 41 Cal.3d 826, the court denied the prosecutor's request.

Critical here is testimony that defendant tried to elicit from Detective Overley after calling him in the defense case. Counsel asked whether Overley and Detective Shave went to Lake Arrowhead to interview Bianca St. James about her relationship with defendant. The prosecutor objected on relevance grounds. He sought to exclude Overley's testimony absent evidence that defendant was in Lake Arrowhead the night of the murder, and that the "main part" of his third party defense was true, i.e., that Denny committed the crime. Defense counsel explained that Overley would testify that Mink and St. James lived near one another, that each house had similar terrain, and that both lived in gated communities. The trial court sustained the objection, giving rise to the present claim on appeal.

In general, third party culpability evidence is admissible if it "rais[es] a reasonable doubt of defendant's guilt." (*Hall, supra*, 41 Cal.3d 826, 833.) This does not mean, however, that no reasonable limits apply. Evidence that another person had "motive or opportunity" to commit the charged crime, or had some "remote" connection to the victim or crime scene, is not sufficient to raise the requisite reasonable doubt. (*Ibid.*) Under *Hall* and its progeny, third party culpability evidence is relevant and admissible only if it succeeds in "linking the third person to the actual perpetration of the crime." (*Ibid.*; see, e.g., *Gutierrez, supra*, 28 Cal.4th 1083, 1136–1137 [no evidence drug dealer named "Pablo" committed the murder]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1325 [65 Cal.Rptr.2d 145, 939 P.2d 259] [no evidence victim was killed by some "man" who frightened her].)

Contrary to what defendant claims, the trial court properly found that Detective Overley's testimony raised no reasonable doubt as to defendant's guilt. When defendant called Overley as a witness, testimony by Goodwin, Brown, and Mink had suggested, *at most*, that two men were in Nguyen's car

in both Garden Grove and Lake Arrowhead on the night of the capital crime, and that defendant might have been one of them. Overley's proffered testimony arguably corroborated these inferences by suggesting that defendant's friend Bianca lived near Mink in Lake Arrowhead, and that defendant was hunting for Bianca's house when Mink saw the car. However, even assuming defendant established that he was in Lake Arrowhead with a third party in the murder victim's car, such fact is not inconsistent with defendant killed, sexually assaulted, and robbed Nguyen earlier that night. In other words, Overley's proffered testimony did not tend to link anyone other than defendant to "actual perpetration" of the charged crime. (*Hall, supra,* 41 Cal.3d 826, 833.) We find no error under state or federal law.[14]

### D. *Sufficiency of Evidence*

Defendant argues here, as he did at the close of the prosecution's case-in-chief (see § 1118.1), that the evidence was insufficient to convict him of the charged crimes. Like the trial court, we reject the claim. After examining the entire record and drawing all reasonable inferences in support of the judgment, we conclude that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) We now discuss each facet of this claim.

#### 1. *Identity*

Defendant contends the evidence was insufficient to identify him as the person who murdered, robbed, and sexually assaulted Nguyen. We disagree.

Motive evidence implicated defendant in the capital crime. (See *Pride, supra,* 3 Cal.4th 195, 245.) In the weeks beforehand, defendant repeatedly told his parole officer and girlfriend that he wanted to leave California and move to Missouri, apparently to see his family. However, he had no car, money, or legitimate source of income to make the trip. The jury could infer

---

[14] The Attorney General suggests defendant has forfeited his complaint about exclusion of Overley's testimony because he relied on it for a different purpose at trial (i.e., to prove the terrain and setting of Bianca's house) than he does on appeal (i.e., to prove defendant and Bianca were friends). But as we have seen, defense counsel mentioned *both* Bianca's relationship with defendant *and* the location of her house as reasons for admitting Overley's testimony below. Also, defendant has consistently maintained that Overley's observations tended to corroborate the third party/Denny theory presented in his opening statement, and that such evidence was relevant and admissible under *Hall, supra,* 41 Cal.3d 826. Thus, while no defendant may complain for the first time on appeal about the exclusion of evidence under a third party theory never presented in the trial court (e.g., *Panah, supra,* 35 Cal.4th 395, 481; *People v. Valdez* (2004) 32 Cal.4th 73, 108–109 [8 Cal.Rptr.3d 271, 82 P.3d 296]), this is not such a case.

that defendant's departure to Missouri on December 17, 1989, which he announced to his girlfriend two hours before the capital crime, triggered a pressing need to acquire cash and a car, and to use illegitimate means if necessary.

Defendant had ample opportunity to meet these needs by committing the capital crime. (See *Pride, supra*, 3 Cal.4th 195, 245.) He was staying nearby with his uncle at the time. Absent any evidence to the contrary, the jury was free to infer that defendant was at the crime scene between 4:00 p.m. (when he called his girlfriend) and 6:00 p.m. (when he stopped at his uncle's house with the white Toyota MR2). During the same two-hour window, Nguyen was accosted and shot behind the Thrifty Drug Store. She carried her purse, and was headed home in her white Toyota MR2. Property taken from Nguyen included items that defendant needed for his Missouri trip—any cash and credit cards in the purse, the keys to the car, and the car itself. Defendant was not seen again in California after he left his uncle's house that night in Nguyen's Toyota.

Contrary to what defendant implies, his possession of Nguyen's stolen property in Missouri suggested he was the killer. (See, e.g., *People v. Bradford, supra*, 15 Cal.4th 1229, 1331 [postcrime possession of murder victim's jewelry and accessories]; *People v. Lewis* (1990) 50 Cal.3d 262, 277 [266 Cal.Rptr. 834, 786 P.2d 892] [same, as to victim's car].) On the morning of December 19, 1989, when first seen by his friend Johnny Forrester in Springfield, defendant had both Nguyen's car and keys. Four days later, on December 23, 1989, defendant used Nguyen's credit card at Sears in Springfield. The jury could reasonably reject defendant's speculative theory that he "stumbled" upon the stolen property and acquired it without attacking or killing the victim.

Defendant also erroneously claims there is a "complete absence" of physical evidence connecting him to the murder victim and the crime scene. After shooting Officer Robinson in Springfield, defendant was arrested carrying the same .25-caliber pistol used to kill Nguyen less than two weeks earlier. The jury could readily conclude that defendant had the murder weapon because he was the murderer, and that he kept it to ward off police and evade capture afterwards. (See, e.g., *People v. Hawkins* (1995) 10 Cal.4th 920, 955 [42 Cal.Rptr.2d 636, 897 P.2d 574] [possession of murder weapon six days later].) Also, defendant was linked to the dumpster alcove in Garden Grove by a pubic hair, and by two partial shoe prints that were consistent with the Nikes he wore when arrested in Missouri. (See, e.g., *People v. Osband* (1996) 13 Cal.4th 622, 654, 691 [55 Cal.Rptr.2d 26, 919 P.2d 640] [shoe prints]; *People v. Berryman* (1993) 6 Cal.4th 1048, 1083 [25 Cal.Rptr.2d 867, 864 P.2d 40] (*Berryman*) [pubic hair].) No blood or hair evidence was associated with anyone other than defendant or the victim.

Finally, defendant engaged in postcrime behavior from which the jury could infer both a consciousness of guilt about the murder and concern for the serious penalties that awaited him in California. (See *Pride, supra,* 3 Cal.4th 195, 246.) For instance, defendant falsely told his friend Johnny Forrester that his girlfriend owned Nguyen's Toyota MR2. Also, after two confrontations with Missouri police, including one in which he was chased in the stolen Toyota, defendant displayed what the jury could view as increasing concern about using the car of a murder victim. On December 23, 1989, defendant told Forrester and another friend, Moots, that he wanted to paint the car black. He also removed Nguyen's license plates and hid the car in Moots's garage. On the same occasion, defendant threatened to "shoot a cop" before returning to California—a threat he fulfilled when he shot Officer Robinson five days later on December 28. The jury could find it highly unlikely that defendant would take such extreme measures to avoid being caught violating parole in Missouri, and that he worried about being identified as Nguyen's killer and charged with murder in California.

For all these reasons, we find ample evidence supporting the jury's identification of defendant as the perpetrator of the capital crime.

### 2. *Robbery*

Defendant attacks the sufficiency of the evidence supporting the robbery-murder theory of first degree murder, the robbery conviction, and the robbery-murder special circumstance. Focusing on the Toyota MR2, defendant maintains that the prosecution did not eliminate the possibility that he moved Nguyen away from the car and used force to render her unconscious *before* he formed the intent to steal, and *before* he actually took such property. Defendant alternatively theorizes that someone else shot Nguyen and stole her car, and that defendant somehow acquired it *after* the use of force and the taking had occurred. Either way, he insists there was insufficient evidence of a "felonious taking" of property from Nguyen's "person or immediate presence" against her will, and "by means of force or fear." (§ 211.)

■ As defendant suggests, robbery requires an intent to steal the property at the time the accused took it. (*People v. Green* (1980) 27 Cal.3d 1, 54 [164 Cal.Rptr. 1, 609 P.2d 468] (*Green*).) Such theft must be accomplished by force or fear. (*Ibid.*) Thus, where the defendant kills the victim, and only thereafter decides to take property in the victim's possession, the force-or-fear requirement has not been met. (*People v. Turner* (1990) 50 Cal.3d 668, 690 [268 Cal.Rptr. 706, 789 P.2d 887].) Moreover, property is within the victim's immediate presence for robbery purposes if it is " ' "so within his reach, inspection, observation, or control, that he could, if not overcome by violence

or prevented by fear, retain his possession of it." ' " (*People v. Hayes* (1990) 52 Cal.3d 577, 626–627 [276 Cal.Rptr. 874, 802 P.2d 376].) In other words, the area must be one within which the victim " 'could reasonably be expected to exercise some physical control over his property.' " (*People v. Webster* (1991) 54 Cal.3d 411, 440 [285 Cal.Rptr. 31, 814 P.2d 1273] (*Webster*).)

We reject defendant's challenge to the robbery evidence insofar as it does not pinpoint how and when he (1) decided to steal the victim's property, (2) killed the victim to deprive her of her property, or (3) took various items of property from the victim. Where a person is left dead or dying in "relative proximity" to property that was taken, and such property is later found in the defendant's possession, the jury is entitled to infer that the victim was robbed and that the defendant committed the crime. (*Webster, supra*, 54 Cal.3d 411, 440 [defendant arrested while driving car of victim who was stabbed to death on riverside trail a quarter-mile from where parked car was taken]; see *People v. Jennings* (1991) 53 Cal.3d 334, 351 [279 Cal.Rptr. 780, 807 P.2d 1009] [defendant found in possession of dead woman's purse a few days after she disappeared and her nude and battered body was left in drainage ditch].) Such facts *support* a robbery conviction. They do not prevent or undermine it.

In the present case, the evidence showed that Nguyen left work carrying her purse and its contents, and the appliqué. She planned to drive home, stopping at the store first. A rational jury could find that she dropped the appliqué behind the Thrifty Drug Store when confronted by her assailant near her car. Given Nguyen's missing shoes, dirty feet, and bruised extremities, the evidence further suggested that she was dragged or forced into the dumpster alcove nearby. There, the jury could find, she was sexually as-saulted (see discussion, *post*) and shot in the head. Several items of Nguyen's property were found in defendant's possession afterwards (e.g., car, keys, and credit card). Knowing that defendant needed money and transportation to make his planned trip to Missouri, the jury could reasonably conclude that he accosted Nguyen intending to steal her purse and car, that such property was on her person or in her immediate presence at the time, and that he used lethal force to thwart her efforts to retain possession and control of it.

Defendant makes an additional and related attack on the sufficiency of the evidence underlying the robbery-murder special circumstance. Emphasizing the lack of any "preexisting" intent to steal, he claims the prosecution did not prove that the murder occurred in "the commission of" a robbery and to advance a felonious purpose independent of any intent to kill. (§ 190.2, subd. (a)(17)(A); see *Green, supra*, 27 Cal.3d 1, 61.) However, for reasons we have explained, a rational trier of fact could readily conclude that defendant—a fleeing parolee who needed money and a car—killed the victim in order to steal her property and to eliminate her as a witness to the robbery.

Hence, as the instructions specifically required, the jury could conclude the murder occurred during the commission of a robbery, for purposes of facilitating it, and that the robbery was not merely incidental to the murder. (*Green, supra,* 27 Cal.3d at p. 61; see *People v. Kimble* (1988) 44 Cal.3d 480, 501 [244 Cal.Rptr. 148, 749 P.2d 803].) We therefore reject this challenge to the robbery-murder special-circumstance finding.

### 3. *Attempted Rape*

Defendant challenges the sufficiency of the evidence of attempted rape supporting the felony-murder theory of first degree murder, the attempted rape conviction, and the related felony-murder special circumstance. He primarily complains that the prosecution did not prove the killer had actual sexual contact with the victim. For instance, no pubic hair was found on (as opposed to near) the body, and no tests identified the semen-like substance in her vagina. Defendant also theorizes that physical trauma found inside the vagina during the autopsy came from consensual marital relations, not from forcible sexual contact by a stranger.

 Forcible rape is a general intent crime involving an act of sexual intercourse accomplished against the victim's will by means of force or fear. (§ 261, subd. (a)(2).) An attempt to commit rape has two elements (see § 664): the specific intent to commit rape, and a direct but ineffectual act done towards its commission. (*People v. Carpenter* (1997) 15 Cal.4th 312, 387 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Such act cannot be merely preparatory, and must constitute direct movement towards completion of the crime. (*Ibid.*) However, attempted rape does not necessarily require a physical sexual assault or other sexually " 'unambiguous[]' " contact. (*Carpenter, supra,* 15 Cal.4th at p. 387 [pointing gun at victim and threatening rape]; see, e.g., *Guerra, supra,* 37 Cal.4th 1067, 1082, 1131–1132 [inflicting odd knife wounds to breasts of fully clothed murder victim who had resisted prior sexual advances].)

The jury could infer that defendant intended to have nonconsensual intercourse with Nguyen by force, and that his actions surpassed mere preparation and constituted attempted rape, as follows: Defendant confronted Nguyen in the parking lot as she approached her car after work. For reasons already explained, he intended to steal her car and purse. However, before taking these items from the scene, defendant forced Nguyen into a secluded area, namely, the dumpster alcove. He tore off her pants and tossed them aside, not taking time to search her pockets for the $31 they contained. Defendant unzipped and possibly lowered his own pants, dropping a pubic hair. Injuries to Nguyen's face and neck may have been inflicted in an ongoing struggle. The dirt on the victim's back, her nudity below the waist,

and her semi-open-leg position suggested that defendant tried to vaginally penetrate her on the ground. Indeed, the jury was free to infer forcible sexual penetration from the bruising, tearing, and semen-like substance found in her vagina. Thus, the evidence supports the elements of attempted rape.

### 4. *Firearm Possession*

Defendant was found guilty, as charged, of being a convicted felon who knowingly possessed a concealable firearm (pistol) in Orange County on December 17, 1989. (See § 12021, former subd. (a), as amended by Stats. 1983, ch. 1092, § 326.5, p. 4062; *People v. Snyder* (1982) 32 Cal.3d 590, 592 [186 Cal.Rptr. 485, 652 P.2d 42].) On appeal, defendant does not dispute that he knowingly possessed a handgun in Missouri after the capital crime (e.g., when he shot Officer Robinson with the murder weapon). However, he faults the prosecution for not proving similar knowledge or possession during the capital crime in Orange County. Defendant argues here, as below, that he fortuitously acquired Nguyen's car after she had been shot by someone else, and that he did not discover the murder weapon inside the car "until after he had driven out of California."

No evidence established that this scenario occurred. The less speculative and more reasonable inference is as follows: Defendant attacked Nguyen in Garden Grove on December 17, 1989, to steal money and a car. After forcing her into the dumpster alcove, where at least an attempted rape occurred, defendant shot Nguyen with a .25-caliber handgun. He drove her car to Missouri, taking the murder weapon for protection against the police. Physical evidence connected defendant—not "Denny" or some other third person—to the crime scene.

Thus, ample evidence established that defendant, who stipulated at trial to being a convicted felon, knowingly possessed a concealable firearm during the capital crime, at the charged place and time. We reject his contrary claim.[15]

---

[15] In challenging the sufficiency of the evidence on appeal, defendant suggests in his reply brief that jurors erroneously convicted him of possessing a firearm because they lacked clear instruction on the relevant facts. He overlooks information that refutes the claim. In addition to giving standard instructions defining the crime, the trial court gave the following special instruction on its own motion explaining the limited time and circumstances under which the firearm offense must have occurred: "As to the charge in Count 4 of the Information, Possession of a Concealable Firearm by a Felon, the People have charged that the crime occurred on December 17, 1989[,] at the same time as the crime of murder as charged in Count 1. [¶] You must not find the defendant guilty of the offense charged against him in Count 4, Possession of a Concealable Firearm by a Felon, unless you find that he committed such crime at that particular time, regardless of your belief as to his commission of the crime at some other time."

E. *Instructional Issues*

 1. *Grand Theft*

Over the prosecutor's objection, defendant asked the trial court to instruct on grand theft as a lesser included offense of robbery. (§ 487, former subd. 3, as amended by Stats. 1987, ch. 599, § 1, p. 1932 [grand theft includes taking of automobile]; see now § 487, subd. (d)(1).) The court denied the request, finding no evidence that defendant stole Nguyen's car or other property except by force or fear. Defendant disagrees. He argues here, as below, that substantial evidence showed that he merely used Nguyen's property after someone else took it by lethal force, or, alternatively, that any intent to steal on his part arose only after the shooting. Failure to give a grand theft instruction allegedly violated defendant's right to due process, a jury trial, and a reliable verdict under the federal Constitution.[16]

██ The trial court must instruct on general legal principles closely related to the case. This duty extends to necessarily included offenses when the evidence raises a question as to whether all the elements of the charged offense are present. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094] (*Breverman*).) ██ It is settled that the crime of theft, whether divided by degree into grand theft or petty theft, is a lesser included offense of robbery. (*People v. Ortega* (1998) 19 Cal.4th 686, 694–697 [80 Cal.Rptr.2d 489, 968 P.2d 48].) Robbery includes the added element of force or fear. (*Id.* at p. 694.)

Nevertheless, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." (*Breverman, supra,* 19 Cal.4th 142, 162.) Such instructions are required only where there is "substantial evidence" from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense. (*Ibid.*; accord, *People v. Manriquez* (2005) 37 Cal.4th 547, 584 [36 Cal.Rptr.3d 340, 123 P.3d 614].)

No substantial evidence established that defendant committed only grand theft and not robbery. Defendant was identified as Nguyen's assailant by strong circumstantial evidence, including motive and opportunity to steal her property, physical evidence placing him at the crime scene, and possession of both the murder weapon and the victim's property afterwards. Viewed charitably, defense evidence merely established that defendant and an unidentified third person *may* have been in the victim's car together after she was

---

[16] At one candid point in the discussion below, defense counsel told the court that the "afterthought[]" theory (i.e., any intent to steal arose only after defendant shot the victim) was not "particularly likely" to succeed in preventing a robbery finding at trial. For this reason, counsel said he would not emphasize such theory in argument to the jury.

sexually assaulted, robbed, and shot in the head. Nothing indicated that such third person committed the capital crime, or that defendant was not involved in the attack. We find no substantial evidence for grand theft purposes that defendant took Nguyen's car and other property from the "real killer," or that defendant formed an intent to steal and took the property only after the shooting occurred. (See *People v. Duncan* (1991) 53 Cal.3d 955, 971 [281 Cal.Rptr. 273, 810 P.2d 131] [no duty to instruct sua sponte on grand theft based on " 'sheer speculation' " that defendant did not kill victim during robbery].) Thus, the trial court did not err in refusing the requested instruction on grand theft as a lesser included offense of robbery.

### 2. *Third Party Defense*

Defendant claims the trial court erred in failing to instruct sua sponte on the proper operation of his third party culpability theory. In particular, the court allegedly "failed to relate the third party defense to the burden of proof" by not instructing the jury that he need not prove the third party guilty of the charged crime, and that he need only raise a reasonable doubt as to his own guilt based on the third party evidence. As a result, violations of defendant's federal constitutional right to due process, compulsory process, and trial by jury allegedly occurred.

Without deciding whether such a sua sponte duty existed, we find no error. The trial court gave standard instructions on the presumption of innocence and on the People's burden of proving defendant's guilt beyond a reasonable doubt. (See CALJIC No. 2.90.) In an apparent abundance of caution, the trial court also gave a special instruction *requested by defendant* clarifying that he bore no such burden of proof, and guiding the jury's consideration of evidence suggesting that a third party committed the capital crime. (Cf. *People v. Bolden* (2002) 29 Cal.4th 515, 558 [127 Cal.Rptr.2d 802, 58 P.3d 931] [instruction pinpointing defense theory of the case is unnecessary even on request where, among other things, no substantial evidence supports it].)

In particular, after reminding jurors of the People's heavy burden of proof, the special defense instruction stated that "it is not necessary for the defendant to prove that another person may have committed the crime, nor is it the burden of the defendant to prove his innocence. [¶] If facts and circumstances have been introduced into evidence which raise a reasonable doubt as to whether the defendant was the person who committed the crime charged, then you must find the defendant not guilty."[17] Thus, consistent with

---

[17] The special defense instruction stated, in full: "The burden is on the state to prove beyond a reasonable doubt not only that the crime was committed, but also that the defendant was the one who committed it. [¶] In this regard, you are instructed that it is not necessary for the defendant to prove that another person may have committed the crime, nor is it the burden of

what defendant claims was required here, jurors knew that he had no duty to prove another person's guilt or his own innocence, and that they must acquit him if the evidence merely "raise[d] a reasonable doubt" as to his guilt of the capital crime. Defendant misreads the record to the extent he suggests the contrary is true.

 We also reject defendant's related challenge to standard instructional language requested by both parties describing the sufficiency of circumstantial evidence of guilt. (See CALJIC No. 2.01.) This instruction directed the jury to accept an interpretation of the evidence favorable to the prosecution and unfavorable to the defense only if no other reasonable interpretation could be drawn. Though the precise nature of defendant's claim is unclear, the challenged instruction could not have "exacerbated" any error in instructing on the relationship between third-party-culpability evidence and burden-of-proof principles, because no such error occurred. As noted above, the trial court instructed the jury, at defendant's request, that evidence implicating a third party need only raise a reasonable doubt to warrant acquittal. We have consistently rejected claims that the standard circumstantial evidence instructions dilute the prosecution's burden to prove guilt beyond a reasonable doubt. (E.g., *People v. Stitely* (2005) 35 Cal.4th 514, 555–556 [26 Cal.Rptr.3d 1, 108 P.3d 182] (*Stitely*); *People v. Millwee* (1998) 18 Cal.4th 96, 160 [74 Cal.Rptr.2d 418, 954 P.2d 990] (*Millwee*); *People v. Ray* (1996) 13 Cal.4th 313, 347–348 [52 Cal.Rptr.2d 296, 914 P.2d 846] (*Ray*).) We reject any similar claim of error here.

### 3. *Reasonable Doubt*

The jury in the present case received a standard instruction establishing the presumption of innocence and defining reasonable doubt. (CALJIC No. 2.90.)[18] Defendant claims the instruction impermissibly diluted the prosecution's burden of proof and violated his federal and state constitutional rights to due process and a jury trial. In particular, the instruction, which has long required jurors to apply the presumption of innocence "*until* the contrary

the defendant to prove his innocence. [¶] If facts and circumstances have been introduced into evidence which raise a reasonable doubt as to whether the defendant was the person who committed the crime charged, then you must find the defendant not guilty."

[18] As given at defendant's trial, CALJIC No. 2.90 provided as follows: "A defendant in a criminal action is presumed to be innocent *until the contrary is proved*, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." (Italics added.)

is proved" (*ibid.*, italics added), allegedly implied that "it was just a matter of time before the jury would find the presumption of innocence had been overcome."

No reasonable jury would interpret the instruction this way. Under defendant's approach, the disputed phrase essentially assumes that the defendant is guilty and that his conviction is inevitable. If so, there would be no need for an advisement on reasonable doubt or the presumption of innocence, because such instruction would always be obviated. We have reached a similar conclusion before. (*People v. Lewis* (2001) 25 Cal.4th 610, 651–652 [106 Cal.Rptr.2d 629, 22 P.3d 392].) We do so again here.

### F. *Cumulative Error and Prejudice*

Defendant asks us to vacate his convictions and the special circumstance findings based on the cumulative prejudicial effect of the errors allegedly committed at the guilt phase (see discussion, *ante*), including the asserted speedy trial and *Miranda* violations. However, we have rejected each of these claims of error. There is no prejudice to cumulate or assess, and no reason to reverse.

## VI. PENALTY ISSUES

### A. *Alleged Misconduct by Detective Shave*

Defendant sought various forms of relief at the penalty phase on grounds Detective Shave manipulated and antagonized two potential defense witnesses while interviewing them, or trying to interview them, before trial. The trial court found no misconduct, and no violation of defendant's right to due process, compulsory process, or a reliable death verdict under the federal and state Constitutions. Defendant repeats these arguments on appeal. No error occurred.

At issue are two motions defendant filed shortly before the guilt trial that affected the eventual penalty trial. One motion sought sanctions against the prosecution in the form of barring the death penalty or, alternatively, denying discovery of defense evidence at the penalty phase. This written motion was coupled with an oral request for an evidentiary hearing in which the defense planned to ask Shave to "admit" the alleged misconduct, as described below. Defendant's second written motion sought discovery of Shave's personnel file insofar as it disclosed similar misconduct in other criminal investigations. (See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] (*Pitchess*).) Exhibits supporting the motions included transcripts of (1) Detective Shave's taped interview with Mitchell DePriest, and

(2) a hearing in an unrelated capital case in which another Orange County judge heard testimony about Shave's conduct in the present case.

The substance of each motion was the same, namely, that Detective Shave had poisoned Mary and Mitchell DePriest (defendant's mother and cousin, respectively) against the defense, and had interfered with their testimony at the penalty phase. First, when Mary expressed regret for "what had happened," Shave remarked that parents should not feel responsible for their children's acts. Mary assured Shave that she did not blame herself. This exchange occurred after Mary declined Shave's request for an interview. Second, based largely on information contained in defendant's parole file, Shave asked Mitchell whether he was the person with whom defendant had reportedly engaged in underage homosexual relations. Shave had no reason to believe that Mitchell (as opposed to another male) was involved. Mitchell denied the charge, and it bothered him.

The court and counsel discussed the foregoing matters at several hearings. Regarding the motion to bar either the death penalty or prosecutorial discovery, the trial court saw no need to hold an evidentiary hearing and delay the start of trial. The court concluded, based on defense exhibits and common sense, that the alleged misconduct had not caused any harm and did not warrant such drastic sanctions. The court could not conceive that Mary and Mitchell DePriest would base their willingness to support defendant, with whom they had lifelong family ties, on their brief contact with Detective Shave, a prosecution agent. Hence, the motion was denied. However, the court agreed to reconsider the matter if the penalty trial disclosed that the defense lost critical evidence because of Shave.

Next, the court and counsel discussed the People's request for discovery of defense evidence at the penalty phase. Defendant basically renewed his request to bar such discovery based on Detective Shave's interview techniques. To ease ongoing concerns over Shave and facilitate reciprocal discovery, the prosecution offered to stipulate to certain conditions, such as preventing Shave from interviewing defense witnesses unaccompanied by another prosecution agent. The court signed an order adopting the stipulated terms.

Finally, the trial court denied discovery of Detective Shave's personnel file. The court found no reason to depart from statutory provisions barring such discovery except for good cause and under narrow circumstances not present here. (See § 832.7; see also Evid. Code, §§ 1043–1047.) Again, the motion was denied without prejudice in the event the facts changed.

Defendant now contends the trial court erred in allowing the prosecution to seek the death penalty and obtain reciprocal discovery, and in denying access

to Detective Shave's personnel records. Though he would have preferred an evidentiary hearing on the issue, defendant insists he presented ample evidence below of "wrongful interference" with beneficial witnesses in violation of constitutional law. Defendant contends that Shave affected the substance of Mary DePriest's testimony, and that he deterred Mitchell DePriest, who did not appear at trial, from testifying at all.

Defendant acknowledges that he must establish three elements to prevail on this claim. First, the misconduct must be so egregious and improper as to turn a willing defense witness into an unwilling one. Second, the misconduct must deprive the defendant of the witness's testimony, or be a substantial cause of such deprivation. Third, the lost testimony must be material and favorable to the defense. (*People v. Lucas* (1995) 12 Cal.4th 415, 457 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *In re Williams* (1994) 7 Cal.4th 572, 603 [29 Cal.Rptr.2d 64, 870 P.2d 1072]; *In re Martin* (1987) 44 Cal.3d 1, 31–32 [241 Cal.Rptr. 263, 744 P.2d 374].)

The record defeats the claim of governmental interference. Nothing establishes that Detective Shave acted inappropriately. Even assuming the contrary were true, defendant did not lose Mary DePriest as a beneficial witness at the penalty phase. She declined Shave's request for an interview, and "appeared and testified on defendant's behalf." (*Panah, supra,* 35 Cal.4th 395, 461 [rejecting claim of prosecutorial intimidation of defense witness who appeared at guilt and penalty phases]; accord, *People v. Hill* (1998) 17 Cal.4th 800, 835 [72 Cal.Rptr.2d 656, 952 P.2d 673].) She described his troubled upbringing, and placed the blame squarely on herself. Detective Shave's conduct had no prejudicial effect on Mary.

We reach a similar conclusion as to Mitchell DePriest. Defendant has not established that Mitchell would have appeared at trial and provided beneficial defense testimony absent Detective Shave's alleged misconduct. Defendant assumes that family members always provide helpful testimony at capital trials, and that Mitchell would have done so too. Yet, the trial court could properly conclude that all inferences ran to the contrary here. In his recorded interview with Shave, Mitchell said that the defense team "gave up on me [because] I wasn't gonna be really that good of a character witness in Tim's defense." Mitchell explained to Shave that he did not have extensive contact with defendant growing up, and that he (Mitchell) "felt more sorry for the [murdered] girl's parents than I d[o] for [defendant]." Mitchell emphasized his reluctance to aid defendant and his disgust over the capital crime.

In sum, defendant has not shown that Detective Shave deprived defendant of beneficial testimony, that the trial court mishandled the issue, or that constitutional violations occurred.[19]

## B. *Motion to Modify Verdict*

Defendant insists the trial court committed various errors in denying the automatic motion to modify the death verdict under section 190.4(e). Such errors, he argues, led to a death sentence that was arbitrary, capricious, and fundamentally unfair under the federal and state Constitutions. We disagree.

 Under section 190.4(e), the jury's imposition of the death penalty triggers a motion to modify the verdict. The trial court must "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances," and must decide whether "the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." (*Ibid.*) In other words, the statute requires the court to make an independent determination concerning the propriety of the death penalty, and to independently reweigh the evidence in aggravation and mitigation and determine whether, in the court's own judgment, the weight of the evidence supports the jury verdict. (*People v. Burgener* (2003) 29 Cal.4th 833, 891 [129 Cal.Rptr.2d 747, 62 P.3d 1] (*Burgener*).) The court need not describe " 'every detail' " supporting its ruling. (*Lewis and Oliver, supra,* 39 Cal.4th 970, 1064.) The statement of reasons (see § 190.4(e)) is sufficient if it allows meaningful appellate review. (*Lewis and Oliver,* at p. 1064.)

Here, defendant presented his arguments both orally and in writing. The trial court responded, at length, with its reasons for not modifying the penalty verdict under section 190.4(e). The court first described its duties under applicable law to independently reweigh the sentencing factors and determine the propriety of the death sentence. The court expressly declined to apply any other standard of review, such as "the sufficiency of the evidence to support the jury's verdict."

The court identified the evidence in aggravation (circumstances of the capital crime, prior felony convictions, and other violent crimes), and described it as overwhelming. (§ 190.3, factors (a)–(c).) Some statutory factors were found to be either neutral (defendant's age at time of crime) (*id.,* factor

---

[19] Defendant's *Pitchess* argument fails for similar reasons. Insofar as defendant sought to discover and use *Pitchess* materials to support his claim of misconduct by Shave, such proof would have been insufficient to establish a constitutional claim of governmental interference, because whatever Shave did, his conduct did not result in a loss of favorable defense testimony.

(i)), or inapplicable (victim or accomplice participation, and duress or moral justification) (*id.*, factors (e)–(g), (j)).

The trial court largely accepted, as mitigating, the evidence emphasized by defendant, especially his dysfunctional upbringing and resulting emotional state. (§ 190.3, factors (d), (h), (k).) However, the court rejected defendant's view that he had received *no* protection, affection, or nurturing from loved ones. According to the court, defendant was never abandoned by his family, and loved ones always intervened to help raise him. The court contrasted defendant's situation with children who must be physically removed from their homes by the state due to parental rape, beatings, or extreme neglect.[20]

Exercising its independent judgment, the court concluded that aggravation far outweighed mitigation, and emphasized the premeditated and brutal nature of the attack on Nguyen. The court noted that while it had not mentioned "every item of evidence" in the record, nothing was omitted from its consideration. The parties were invited to seek clarification and express any concerns. However, both of defendant's attorneys had "nothing" to say. The court then denied the motion.

Preliminarily, defendant has forfeited the right to challenge the trial court's ruling. He did not object on any ground below. Defendant cannot do so for the first time on appeal where, as here, the modification hearing (held in 1994) postdated the finality of *People v. Hill* (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984] (which imposed the objection requirement). (*Lewis and Oliver, supra*, 39 Cal.4th 970, 1064.) The court's solicitation of questions and complaints *before* denying the motion undermines defendant's suggestion that an objection would have been futile, and would not have prevented any of the errors cited on appeal.

On the merits, we reject defendant's argument that the court "improperly deferred to the jury's verdict." The court articulated the correct standard of review. It also applied that standard to independently review the evidence and weigh the sentencing factors. This case is not one in which the record provides "no assurance the court was aware of and exercised its independent judgment." (*Burgener, supra*, 29 Cal.4th 833, 891 [criticizing trial court's apparent reliance on deferential substantial-evidence standard].)

---

[20] Defendant specifically asked the court to consider and weigh the following mitigating evidence: Early exposure to lesbianism and prostitution; emotional abandonment and lack of a stable maternal relationship; exposure to violence and to his mother's incarceration; misinformation regarding his father's identity; failure of any relative to protect him; exposure to alcohol and drug use; lack of proper schooling and childhood companions; lack of affection and nurturing; mental disturbance; and lengthy imprisonment in Missouri.

Defendant contends the trial court failed to consider relevant evidence offered in mitigation, such as expert testimony of psychosexual disturbance and extreme emotional abuse suffered as a child. Defendant also complains the court relied on irrelevant evidence outside the appellate record involving the fate of other children in the child welfare system.

We disagree. The trial court considered the entire record, and paid particular attention to evidence emphasized by the defense. Its ruling made clear that any failure to mention specific mitigating facts did not mean they had been ignored. By alluding to severe forms of child abuse *not* present in the record, the court simply sought to illustrate the weight it placed on the childhood evidence that *was* introduced. Thus, defendant's complaint is not that the court failed to properly consider and weigh mitigation, but that it reached an unfavorable result. We have no basis on which to set the result aside. (See *Berryman, supra,* 6 Cal.4th 1048, 1107 [rejecting, as unfounded, defendant's challenge to outcome of modification motion]; see also *People v. Carter* (2005) 36 Cal.4th 1114, 1211 [32 Cal.Rptr.3d 759, 117 P.3d 476] [appellate court makes no de novo penalty determination].)

## C. *Constitutional Challenges to Death Penalty Law and Related Claims*

Defendant raises numerous challenges under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the constitutionality of the statutory scheme under which he was sentenced to death, and the manner in which it was applied to him. Many of these claims concern standard instructions given at his penalty trial (including some incorporating the statutory language itself), or involve instructions that the court declined to give on request. Other claims attack statutory features or sentencing procedures on grounds unrelated to the instructions. However framed, such claims have been rejected before. We do so again here. It appears defendant presents these issues, at great length, primarily to preserve and "relitigate" them in other court proceedings. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 303–304 [33 Cal.Rptr.3d 397, 118 P.3d 451] [discussing presentation and preservation of claims routinely rejected in prior cases].)

The trial court did not err in declining defendant's request to define life imprisonment without the possibility of parole as meaning that he would stay in prison for the rest of his natural life. Such an instruction is inaccurate given the Governor's commutation and pardon powers. On the other hand, the concept of life in prison with no possibility of parole is clear. (*People v. Arias* (1996) 13 Cal.4th 92, 172, 173 [51 Cal.Rptr.2d 770, 913 P.2d 980].) We are not persuaded by empirical claims made outside the appellate record and untested at trial suggesting the contrary is true. We also find nothing in *Shafer v. South Carolina* (2001) 532 U.S. 36 [149 L.Ed.2d 178, 121 S.Ct.

1263], undermining the standard instruction insofar as it lacks the definition that defendant sought here. The *Shafer* jury never learned that a life term carried no possibility of parole, while defendant's jury was so informed. (*People v. Cornwell* (2005) 37 Cal.4th 50, 103 [33 Cal.Rptr.3d 1, 117 P.3d 622] (*Cornwell*).)

The trial court properly instructed on which guilt phase instructions apply at the penalty phase. In particular, the standard instructions did not mislead the jury as to its responsibility to consider sympathy, mercy, and any other aspect of defendant's character and record in mitigation. (See CALJIC Nos. 8.84.1, 8.85, factor (k); *People v. Steele* (2002) 27 Cal.4th 1230, 1255–1257 [120 Cal.Rptr.2d 432, 47 P.3d 225].)

The sentencing factors in section 190.3, and the closely related instructions in CALJIC No. 8.85, do not suffer from the flaws urged by defendant. Our reasoning is as follows.

First, section 190.3, factor (a) (circumstances of the capital crime) is not vague. (*Tuilaepa v. California* (1994) 512 U.S. 967, 980 [129 L.Ed.2d 750, 114 S.Ct. 2630].) The same facts (e.g., felony murder) may be used for conviction, special circumstance, and aggravating purposes given the distinct role such facts play at each phase. The court need not instruct sua sponte against such use. (*Cornwell, supra*, 37 Cal.4th 50, 103; *Ray, supra*, 13 Cal.4th 313, 358.)

Second, section 190.3, factor (b) (violent criminal activity) is not vague. (*Tuilaepa v. California, supra*, 512 U.S. 967, 980.) Nothing bars use of the same crime under factor (b) and factor (c) (prior felony convictions). No sua sponte instruction against such double-counting is required. (*Gutierrez, supra*, 28 Cal.4th 1083, 1154; *People v. Barnett* (1998) 17 Cal.4th 1044, 1180 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Contrary to what defendant suggests, the prosecutor did not tell the jury to count such factors twice for the same purpose. He said that factors (b) and (c) were "different," and accurately explained why this was so.

Third, as to defendant's remaining challenges to CALJIC No. 8.85 and the statutory factors, the trial court was not compelled to delete inapplicable factors, designate factors as aggravating or mitigating, or state when the balance of factors warrants death. (*Stitely, supra*, 35 Cal.4th 514, 574; *Ray, supra*, 13 Cal.4th 313, 355–356.)

Defendant argues that the court erred in failing to give a lingering doubt instruction at the penalty phase, and thereby caused jury confusion over use of the concept as a permissible factor in mitigation. However, no lingering

doubt instruction was required. (*Millwee, supra,* 18 Cal.4th 96, 165–166.) The concept is encompassed in section 190.3, factor (k) and related instructions. (*People v. Avila* (2006) 38 Cal.4th 491, 615 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

Defendant engages in a broad and misguided attack on CALJIC No. 8.88, a standard instruction defining the scope of the jury's sentencing discretion under section 190.3. As we have made clear, the instruction does not prevent either the proper weighing of aggravating and mitigating factors, or an individualized sentencing determination. (*People v. Moon* (2005) 37 Cal.4th 1, 42–44 [32 Cal.Rptr.3d 894, 117 P.3d 591] (*Moon*).) The presumption that jurors understood such instructions, and particularly the concept of mitigation, is not rebutted by extraneous empirical claims. (*People v. Welch* (1999) 20 Cal.4th 701, 772–773 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

Likewise, the statute and related instructions (see § 190.3; CALJIC No. 8.88) are not infirm insofar as they fail to require a reasonable doubt determination as to both aggravating factors (except factor (b)) and the penalty determination. Nor are the statute and instructions unconstitutional in not demanding juror unanimity on aggravating factors, or a presumption favoring the imposition of a life sentence. The decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], do not change these conclusions. (*Lewis and Oliver, supra,* 39 Cal.4th 970, 1068; *Moon, supra,* 37 Cal.4th 1, 44.)

Other alleged flaws in the "machinery" of capital punishment do not require invalidation of California's statutory scheme in the following areas: (1) scope of the class of death-eligible first degree murderers, (2) failure to require written findings of aggravating factors, (3) exercise of prosecutorial discretion to invoke the law, (4) clarity of the law and instructions to lay jurors, including lack of guidance on death being the greater penalty, and use of such terms as "extreme" and "substantial" for certain mitigating factors, and (5) any delay in executing the death sentence. (*Lewis and Oliver, supra,* 39 Cal.4th 970, 1068; *Moon, supra,* 37 Cal.4th 1, 42, 43; *People v. Ochoa* (1999) 19 Cal.4th 353, 478 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

The death penalty scheme withstands constitutional scrutiny even though it fails to require "intercase" proportionality review. (See *Pulley v. Harris* (1984) 465 U.S. 37, 50 [79 L.Ed.2d 29, 104 S.Ct. 871]; *People v. Ramos* (1997) 15 Cal.4th 1133, 1182 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

Defendant's death sentence was not grossly disproportionate to his individual (i.e., "intracase") culpability. (See *People v. Dillon* (1983) 34 Cal.3d

441 [194 Cal.Rptr. 390, 668 P.2d 697].) He planned to visit his family in Missouri around Christmas. Broke and on parole, he robbed and shot a young woman as she departed work alone at night. In the process, he sexually assaulted her. Defendant left the victim to die in degrading circumstances with no regard for either her or her loved ones. Defendant had raped and robbed before, and sustained convictions for such crimes. His later attacks were more violent than the earlier ones. Defendant acted on his boast to a friend, and used the murder weapon to shoot a police officer in order to avoid arrest. Under the circumstances, defendant's death sentence does not shock the conscience or offend basic notions of human dignity. (*People v. Stanley* (2006) 39 Cal.4th 913, 967 [47 Cal.Rptr.3d 420, 140 P.3d 736].)

Execution by lethal injection does not constitute cruel and unusual punishment per se. (*Boyer, supra*, 38 Cal.4th 412, 484.) Any failure of corrections officials to adopt proper standards for the administration of lethal injection does not affect the validity of defendant's death judgment. (See § 3604, subd. (a).) Alleged imperfections and illegalities in the execution process that may or may not exist when his death sentence is implemented are premature. (*Boyer, supra*, 38 Cal.4th at p. 485.)

Defendant asserts that constitutional violations occurring during his capital trial deprived him both of a fair hearing before an independent tribunal, and of minimum guarantees for the defense under customary international law. But international law does not bar a death sentence that complies with state and federal constitutional law and statutory requirements. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

The trial court correctly denied defendant's motion for sentencing under the "Three Strikes" law (§ 667, subds. (b)–(i)), and concluded that such legislation has no retroactive ameliorative effect. As we have explained, the Three Strikes law did not abolish the death penalty for defendants who are convicted of first degree murder with special circumstances, and who have one or more prior violent or serious felony convictions. (*People v. Alvarez* (1996) 14 Cal.4th 155, 246–247 [58 Cal.Rptr.2d 385, 926 P.2d 365].) We decline to reconsider this determination. (*People v. Lucero* (2000) 23 Cal.4th 692, 739 [97 Cal.Rptr.2d 871, 3 P.3d 248].)

D. *Cumulative Error and Prejudice*

Defendant insists the errors allegedly committed at his penalty trial (see discussion, *ante*) were prejudicial either singly or in combination. Defendant asks that we assess such prejudice under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. For reasons we have explained, none of the claims of error has

merit. We thus have no reason to consider the applicable standard of prejudice or to reverse the death judgment on the stated ground.

## VII. DISPOSITION

The judgment is affirmed in its entirety.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied October 24, 2007, the opinion was modified to read as printed above.